[Crim. No. 3381. In Bank.—March 13, 1931.]

THE PEOPLE, Respondent, v. WILLIAM HENRY BURKHART, Appellant.

Orbison & Irwin and Charles J. Orbison for Appellant.

U. S. Webb, Attorney-General, and John D. Richer, Deputy Attorney-General, for Respondent.

WASTE, C. J.—The defendant was charged with the murder of Ann McKnight Burkhart, his estranged wife. The jury brought in a verdict finding the defendant guilty of murder in the first degree and recommending that he suffer the death penalty. This appeal is from the judgment of conviction and from the order denying defendant's motion for new trial.

The homicide of which defendant stands convicted occurred on March 24, 1930, at a time when the parties were living separate and apart, the deceased having theretofore instituted divorce proceedings. On two distinct occasions prior to the homicide, the defendant had attempted in vain to get in touch with his wife, with the view of having her return to him, and, upon being informed by the persons with whom she was living that his wife would not return to him, he stated: "By God, I will have her. She is my wife and if I can't have her nobody else shall because I will kill her first;" and, "I have made up my mind that if I cannot have her nobody else will if I have to spend the rest of my life in the penitentiary." On the day preceding the homicide defendant purchased a Ford coupe under the name of Charles G. Thompson, and gave a fictitious check for the initial payment. On the day of the homicide he resigned his position with the Los Angeles Gas & Electric Corporation and drew his pay. Immediately thereafter he rented a bungalow court apartment under the name of C. L. Burns and gave a fictitious check in payment of the first month's rent. The defendant informed the owner of the apartment that he was married and that his wife was working and would arrive about 6:30 that evening. At that time defendant appeared at the apartment house with the deceased and introduced her to the owner, who was then sprinkling the lawn. Within a very few minutes after the parties had entered the door of the apartment was jerked open and the owner saw the deceased standing between the

open door and the closed screen door. The defendant appeared behind the deceased, placed his arm around her and drew her back into the room. As this was done the deceased uttered a "guzzling sound, sort of a moaning cry". Approximately one-half hour later the defendant and deceased left the premises in the Ford coupe. Later that evening the defendant went to the apartment occupied by Mr. and Mrs. J. S. Thompson to "borrow a match", and stated to those present that he had just moved in next door and had been drinking and was "pretty stiff", adding that his wife was "stiffer". After defendant had apparently returned to his own apartment, a noise, resembling the falling of a human body, was heard by the Thompsons and their guests. The defendant returned to the Thompson apartment and asked if he might talk to Mr. Thompson "as a friend", whereupon Thompson followed him to his apartment. Defendant then told Thompson that his wife "had passed out drunk" in back of the house, and requested him to help lift her into the house. Thompson and one of his guests went through the defendant's apartment to the rear sidewalk or alleyway, where they found the deceased's body. The police were summoned, and the defendant was taken into custody. Upon his person was found a full loaded .38 calibre Smith & Wesson revolver. This weapon, found to have powder burns at the point where the chamber fits to the barrel, gave off a slight acrid odor, indicating that it had been recently discharged. The autopsy surgeon testified that the deceased had come to her death by reason of bullet wounds, five bullets having entered various parts of her body. A ballistic expert gave as his positive opinion that the bullets extracted from the deceased's body had been fired from the gun found on the defendant's person at the time of his arrest. Examination of the Ford coupe disclosed two bullet holes in the upholstery of the car and several blood-stains, tending to indicate that the homicide had been committed in the car after the parties left the apartment at approximately 7 in the evening. The bullets thereafter removed from the car were identified as having been discharged from a gun similar in make and calibre to the one found in the defendant's possession.

The evidence points positively and unmistakably to the defendant as the perpetrator of the homicide. He admits the sufficiency of the evidence to support a conviction, but contends that the overwhelming evidence shows that he had been on a protracted "spree" for several weeks, and on the day of the homicide was so intoxicated as to be incapable of fully comprehending the nature and quality of his acts. By reason of such prolonged voluntary intoxication, he argues, his physical and mental condition were such as to exclude any idea of the intent, deliberation and premeditation essential to murder of the first degree. Therefore, he contends that a verdict of manslaughter is the only verdict warranted by the evidence.

Defendant's claim of prolonged inebriation prior to the homicide finds some support in the evidence introduced on his behalf, but such inebriation is by no means as conclusively nor as overwhelmingly established as contended. The testimony adduced by the prosecution created a sharp conflict on this issue. There is evidence that the defendant worked continuously up to the time of the homicide, resigning his position only a few hours prior thereto. The witness Hunter Graham, from whom defendant purchased the Ford coupe on the day preceding the homicide, testified that defendant was not under the influence of intoxicating liquor when dickering for the car. The owner of the bungalow court apartments stated that she had seen defendant three times on the day of the homicide, the last time being as late as 7 in the evening, and that he did not appear to be under the influence of intoxicants at any of these times. Mrs. Thompson corroborated this testimony, and also stated that defendant appeared perfectly normal when he came to her apartment after 10 o'clock on the night of the homicide, with the exception that his speech was a little slow. Mr. Thompson gave virtually the same testimony, and stated that while, in his opinion, the defendant had imbibed of intoxicating liquor, he was not drunk, and only appeared to be so when in the custody of the police. One of the arresting officers stated that defendant was only "spasmodically" intoxicated, and in his opinion was simulating drunkenness. This witness also testified that defendant answered all preliminary questions as to name, age, occupation, etc., in a coherent manner, but would lapse into a "coma" when directly questioned concerning the homicide.

Voluntary intoxication is never an excuse for crime, but whenever the existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the jury, in determining whether such purpose, motive or intent actuated the accused in the perpetration of the offense, may properly take into consideration the fact that he was intoxicated at the time. (Sec. 22, Pen. Code; *People* v. *Methever*, 132 Cal. 326 [64 Pac. 481]; *People* v. *Blake*, 65 Cal. 275, 277 [4 Pac. 1]; *People* v. *Sainz*, 162 Cal. 242, 245 [121 Pac. 922].) The weight to be given to evidence of intoxication and whether such intoxication precluded the accused from forming a specific intention to kill and murder, which intent is a necessary element in murder in the first degree, are essentially questions of fact for the jury's determination under proper instructions. (*People* v. *Yeager*, 194 Cal. 452, 474 [229 Pac. 40]; *People* v. *Sainz*, *supra*.) The jury's implied finding in this case that the killing was the product of an abandoned and malignant heart, and was premeditated, finds ample support in the record, and warranted the infliction of the death penalty. We see no real analogy between this case and that of *People* v. *Kelley*, 208 Cal. 387 [281 Pac. 609]. Here, as distinguished from the Kelley case, there was a motive for the crime, for the deceased had separated from the defendant and he had threatened to kill her to prevent anyone else from having her. There is also a showing of preparation and premeditation in the case now before us, which showing was not made in the Kelley case, for the defendant here resigned his position, and purchased a car and rented an apartment under fictitious names. The car and the apartment were apparently intended to be and were used in the commission of the homicide. The case is not one, therefore, in which the deceased was killed under circumstances which might have shown an accidental or unpremeditated killing, as in the Kelley case. She was slain with a deadly weapon from which five bullets were discharged into her body. In our opinion, the jury had no alternative but to bring in a verdict of first degree murder.

Defendant next contends that the trial court erred in permitting the prosecution to show that shortly prior to the homicide he had purchased the Ford coupe and rented the bungalow apartment under assumed names, and had issued

fictitious checks in consummation of each transaction. He argues that such evidence was inadmissible because it tended to prove the commission of other and distinct crimes in no way connected with the offense charged in the information.

■ Ordinarily, evidence of the commission by the defendant of crimes, other than the one for which he is standing trial, is inadmissible. This is not an inexorable rule, and, whenever proof of one crime tends to prove any facts material in the trial of another, such proof is admissible, and the fact that it may tend to prejudice the defendant in the minds of the jurors by inducing the belief that he had been the perpetrator of another crime is no ground for its exclusion. (*People* v. *Nakis,* 184 Cal. 105, 114 [193 Pac. 92].) The evidence here complained of had a material bearing on the charge of which the defendant stands convicted. ■ The fact that shortly prior to the homicide he purchased an automobile and rented an apartment under fictitious names, and issued checks therefor, and thereafter apparently shot the deceased while in the car so obtained, and brought her to the apartment thus rented, tended to show preparation and premeditation on his part and an attempt to conceal his identity. It also revealed his plan or scheme for doing away with the deceased. The testimony of the police officer and the bank manager along this same line was also properly admitted. Nor do we think any of this evidence was rendered inadmissible by reason of defendant's offer to stipulate that he had purchased the car and rented the apartment. Such a stipulation would not have disclosed that defendant, prior to the homicide, was proceeding under assumed names to divert suspicion from him.

■ It is also urged that the court below erred when it permitted the prosecution to introduce a photograph (exhibit No. 24), showing the position and condition of the deceased's body when found. This picture is asserted to be obscene and shocking, and to have been introduced solely for the purpose of inflaming the minds of the jurors against the defendant. The exhibit is all that the defendant states, and the prosecution is not to be commended for offering it in evidence. Its introduction was not necessary, and added little to the case against the defendant. However, we cannot say it was inadmissible, and for this reason the assignment is without merit.

■ Defendant next asserts that the court below fell into error when it refused to give an instruction tendered by him which had to do with the effect of intoxication upon the species or degree of crime perpetrated. This instruction, if given, would have told the jury that, should they find defendant was so intoxicated at the time of the commission of the homicide as to be incapable of forming a premeditated design or entertaining the necessary malice, the offense would be reduced to manslaughter. The substance of the refused instruction was adequately covered by other instructions given. The record discloses several instructions distinguishing between murder and manslaughter, and others covering the subject of intoxication and its effect upon the species and degree of crime. There is, therefore, no merit in the point.

■ In his next assignment of error, the defendant advances some eighteen or twenty charges of misconduct on the part of the district attorney during the progress of the trial. To review them in detail would unduly prolong this opinion, and would serve no useful purpose. We have separately examined each of these many assignments, and have found nothing of a prejudicial character. At times, the district attorney may have exceeded the bounds of propriety, but, whenever necessary to protect the rights of the accused, the trial court immediately rebuked the prosecutor, and forcefully admonished the jury to disregard anything stricken from the record as not intended for its ears. It will be presumed that the jurors were true to their oaths and followed the various admonitions and instructions of the court. In fairness to the prosecuting officer, it must be said that most of the charges of misconduct leveled at him by the defendant are without merit.

Defendant's final contention is that the verdict of the jury recommending the death penalty, and the judgment of the court sentencing him to hang, are excessive. Our discussion and disposition of the first assignment of error sufficiently dispose of this point.

The judgment and order are, and each is, affirmed.

Richards, J., Shenk, J., Curtis, J., Preston, J., and Seawell, J., concurred.

Rehearing denied.