[Crim. No. 1909. First Appellate District, Division One.—November 18, 1936.]

THE PEOPLE, Respondent, v. FALLIE SUTTON, Appellant.

562

E. Walter Lynch for Appellant.

U. S. Webb, Attorney-General, and Seibert L. Sefton, Deputy Attorney-General, for Respondent.

KNIGHT, J.—The appellant, Fallie Sutton, was charged jointly with Louis Sly and LeRoy Bussey with the crime of murder. They entered pleas of not guilty, and Sly and Sutton interposed additional pleas of not guilty by reason of insanity. The trio were tried together, and the jury found Bussey not guilty, and Sly and Sutton guilty of first degree murder and assessed their punishment at life imprisonment. Thereupon, Sly and Sutton withdrew their pleas of not guilty by reason of insanity, and when arraigned for judgment Sutton alone made a motion for new trial. The motion was denied, and each was sentenced to life imprisonment in conformity with the verdict of the jury. From said judgment of conviction and the order denying his motion for new trial Sutton alone prosecutes this appeal.

The victim of the killing, A. W. Knight, was eighty-five years old and quite feeble. For a number of years he had been living alone in a small ark on the waterfront bordering the town of Antioch, Contra Costa County and Bussey lived in an ark next to and a few feet distant from Knight's ark. About 11 o'clock on the morning of February 15, 1936, a neighbor while passing Knight's ark noticed the front door thereof had been broken, and fearing something might have happened to the aged man she entered and found him in a dazed, stuporous condition and unable to speak, as the result of having been beaten about the face and head. She summoned the police and he was removed to a hospital where the extent of his injuries was ascertained. His face and head were a mass of swollen bruises and abrasions. His eyes were blackened, and swollen nearly shut; his ears were bruised, lacerated and swollen, and there was a cut over one of them. His jaw was badly broken in several places, his skull was fractured, and he was bleeding at the mouth, nose and ears. About a week later he succumbed to his injuries without having regained consciousness.

The evidence shows that on the afternoon preceding the finding of Knight in the battered condition above described,

the three defendants spent most of the afternoon and evening in Bussey's ark drinking claret wine; and at the outset of appellant's brief he admits that "as an aftermath of that party" he and his two companions entered Knight's ark and that Knight "was killed by one or more of said three people". He contends, however, that there is no legal proof that he personally struck any of the blows which caused Knight's death, and that therefore his conviction is not legally supported; and he further contends that in any event the evidence against him establishes no greater crime than manslaughter and that the judgment of conviction as to him should be reduced accordingly. There is no merit in either of the foregoing contentions.

After having established by ample evidence, direct and circumstantial, that the deceased met his death through criminal agency, the prosecution introduced its testimony to connect the three defendants with the commission of the crime. It consisted in part of the declarations and admissions made by them to the officers on the day following the assault and within a day or two thereafter; and as the testimony was being received the trial court properly admonished the jury, repeatedly, that the declarations of one defendant made out of the presence of the others, subsequent to the assault, could be considered only as against the one making the declarations and must not for any purpose be taken as evidence against the other two. The final statements made by the respective defendants as to what happened that afternoon and evening were substantially alike except as will be hereafter noted; and the following are the facts as they appear therefrom: The defendants met at Bussey's ark about noon, and after consuming the first supply of wine which Sly had purchased, the defendants went up town and purchased more wine with money obtained from the sale of a gold-crowned tooth belonging to appellant which had been recently extracted. Returning to Bussey's ark they continued to drink and ate some sandwiches which Bussey had purchased. When the second supply of wine was about gone they talked about buying more, but evidently were without funds; whereupon Bussey suggested that Knight had a gun in his ark which he had no use for; and shortly after the suggestion was made they proceeded to get it. Sly went over to Knight's ark first but was unable to gain entrance, and he

talked with Knight through the closed door. That was before dark. Later on, during the evening, Sly again went over there for the same purpose. Appellant accompanied him and they took an axe along with them; and when Knight refused to let them in or give them the gun they broke down the door with the axe and entered. Knight still refused to let them have the gun or tell them where he kept it, whereupon he was beaten about the head and face. He fell or was knocked down, but the beating continued until he could hardly speak. All he could do was to mumble his words. There is a conflict between the statements made by Bussey and appellant as to whether Bussey was with Sly and appellant when they entered Knight's ark. Appellant said he was, but Bussey claimed that he fell asleep in his ark while the drinking was going on and was awakened by the hollering over at Knight's ark; that he went over there, and found Knight lying partly on the floor and partly on the bed, wounded and bleeding; that appellant was standing beside Knight saying, ''Come on and tell me where it is''; and the only reply the old man made was, ''Go away, go away''. Bussey then said, according to his statement, ''What in hell is the matter'', and after lighting a match he and appellant lifted Knight on the bed. About this time, so. Bussey claimed, Sly, who was standing at the door of the ark, came in and said: ''Didn't the old son-of-a-bitch tell you where it is yet?'' and he told Bussey to look around for the gun, which he proceeded to do, but while he was doing so appellant and Sly began striking Knight about the head and face with their hands and with a hard leather gun holster about a foot long, and according to Bussey, appellant also used a hatchet handle. Finally Bussey told them to let Knight alone, and to ''get the hell out of there''; whereupon all of them left. Sly went home; but Bussey and appellant went up town, and after loitering around a liquor tavern for a while, they also went to their homes.

Appellant's final version of the affair as told to the officers did not differ materially from the foregoing except he claimed he did not strike Knight at all. He admitted breaking into the ark with Sly for the avowed purpose of getting the gun, and he also admitted being present when Knight was beaten for refusing to give up the gun or to reveal its whereabouts; but he claimed that Sly committed all of the violence.

In corroboration of the facts and circumstances thus established by the declarations of the defendants, the prosecution introduced the testimony of a number of disinterested witnesses. A man named Worrell who. dropped in during the afternoon and drank some wine with the defendants, but who left about 5 o'clock, testified that just before he left Sly went over to Knight's ark, stating he was going to get the gun; and Worrell and two other witnesses testified that they saw Sly trying to get into Knight's ark and heard him talking to Knight through the closed door; and one of them heard him say as he returned to Bussey's ark, ''You can't even scare the old fool''. Another witness saw appellant and Sly smashing the door with the axe. Another heard appellant's voice inside Knight's ark saying, ''Hurry up, hurry up''; and another heard someone inside say, ''Where is that gun you old son-of-a-bitch, or I'll throw you in the river''.

The evidence further shows that on the morning following the assault Bussey went up to appellant's house and told him ''the old man was in a bad way''; and thereupon they proceeded to concoct an alibi. They were overheard doing so by an occupant of the house who was in an adjoining room and who testified at the trial. In this regard appellant and .Bussey agreed to tell the officers, if questioned, that while the three of them were walking down the railroad track they met a stranger who inquired where Knight lived, and they pointed out the ark to him; that later on that night they happened to be passing Knight's ark and hearing someone inside groaning, they went in and found Knight on the floor badly beaten; that they picked him up and put him on the bed, and then left. Later on that same morning the chief of police responded to the call to go to Knight's ark, and on the way back to his office he picked up Bussey and questioned him as to his whereabouts the night before, and Bussey related the story he and appellant had fabricated. Appellant was then sent for and he told the chief of police substantially the same story. Both denied knowing who had assaulted Knight. Sly was then brought in and questioned, but he told an entirely different story. It coincided substantially with the facts afterwards established at the trial. After hearing Sly's story the officers again interrogated Bussey and appellant, and when they were informed of Sly's confession they admitted that the previous story they had told was

false and was concocted by them under the circumstances above stated. Thereupon they changed their stories to conform substantially with Sly's; but it was not until the next day or two that most of the truth of the affair was ascertained.

The defendants did not take the witness stand, nor did they offer any testimony to contradict the prosecution's evidence relating to the circumstances of the assault. Bussey and appellant introduced a number of character witnesses; and appellant offered the testimony of a dentist as to the possible effect of the excessive use of alcoholic liquors upon the mental condition of a person suffering from infected teeth. Sly introduced no evidence whatever.

█ By statute it has long since been the declared law of this state that all murder committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree (Pen. Code, sec. 189); and therefore, in conformity with the terms of the statute it has been held repeatedly that if in the perpetration or attempt to perpetrate one or more of the felonies above named a person kills another he is guilty of first degree murder by force of the statute whether the killing be wilful, deliberate and premeditated, or even accidental, because the statute applies to all homicides so committed and not merely to such as might be planned as part of the execution of the felony intended. (See cases cited in 13 Cal. Jur., pp. 600–602.) █ As will be seen, the evidence in the present case shows that the assault which resulted in Knight's death was committed in perpetrating a burglary, that is, by forcibly entering Knight's ark with the burglarious intent either to steal his gun or take it from him unlawfully by the use of force and fear. Therefore the evidence was of such a nature as to support no other conclusion than that the crime was murder of the first degree. █ Furthermore, it is well established that where two or more persons conspire to commit any one of the felonies designated in said section 189, and in furtherance of the common purpose a homicide is committed by one of the confederates, all persons so engaged in the criminal enterprise, whether or not they actually do the killing, are as accountable to the law as though their hands had intentionally given the fatal blow or fired the fatal shot; and under such circumstances the jury has no option but

to render a verdict of murder in the first degree whether the killing was intentional or accidental. (*People* v. *Perry*, 195 Cal. 623 [234 Pac. 890]; *People* v. *DiDonato*, 90 Cal. App. 366 [265 Pac. 978].) In the present case there is ample evidence to sustain the conclusion that appellant actually participated in the violence which resulted in Knight's death; but even assuming he did not personally strike any of the fatal blows, he is nevertheless equally as guilty as the one who did, because, as shown, he conspired to burglarize Knight's ark for the purpose of getting the gun, and therefore the moment he entered into the criminal enterprise the law fastened on him the intent which made any killing in the perpetration of the burglary or immediately connected therewith, or which resulted therefrom as a natural and probable consequence of the unlawful enterprise, murder of the first degree.

Nor is any act committed by a person while in a state of voluntary intoxication less criminal by reason of his having been in such condition. (Pen. Code, sec. 22.) As provided in said section 22, when a specific intent is an element of a crime it is a matter for the jury to determine whether the accused was so intoxicated as to be unable to form that intent. (*People* v. *Sainz*, 162 Cal. 242 ]121 Pac. 922]; *People* v. *Murphy*, 1 Cal. (2d) 37 [32 Pac. (2d) 635].) Here the people concede appellant was drinking excessively on the afternoon in question, but the evidence is conflicting as to the state of his intoxication. Witnesses who saw him in the liquor tavern shortly after the assault was committed testified that although it was apparent he had been drinking, he was not drunk; furthermore, the next morning his recollection as to what happened the afternoon and evening before was sufficiently clear to permit him to concoct an alibi, and afterwards to give a corrected, detailed account of what occurred. Therefore, in view of the conflict, the question of the degree of appellant's intoxication at the time of the assault was one of fact for the jury to pass upon; and by its verdict it resolved the conflict against appellant.

The assistant district attorney in relating the declarations made to him by the defendants testified over appellant's objection that during his last interview with appellant and Sly, which was had in the presence of Bussey, he informed them that Bussey had told him that they struck Knight

with the gun holster, and that appellant had also used a hatchet handle; and he asked them if "that was right". Sly admitted using the holster, but appellant replied that he did not remember striking Knight with the holster or hatchet. Appellant assigns the testimony as error. It is evident, however, that it cannot be deemed prejudicial for the reason that the evidence proves beyond question that appellant entered into a criminal conspiracy to commit a burglary, and he admits being present when Knight was assaulted by Sly in the perpetration of that crime. Therefore, as already pointed out, regardless of whether appellent personally struck any of the fatal blows, he was equally as guilty of first degree murder as the one who committed the violent acts.

After an examination of the entire record, including the evidence, it is our conclusion that appellant was fairly tried, and that the verdict as to him has not resulted in a miscarriage of justice. The judgment of conviction and order denying the motion for new trial are therefore affirmed.

Tyler, P. J., and Cashin, J., concurred.