[Crim. No. 5981. In Bank. Apr. 9, 1957.]

THE PEOPLE, Respondent, v. JOHN E. CHEARY, Appellant.

Jack B. Lamb for Appellant.

Edmund G. Brown, Attorney General, Thomas W. Martin, Chief Assistant Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

TRAYNOR, J.—A jury returned a verdict that defendant was guilty of murder in the first degree and fixed the punishment at death. The trial court denied a motion for new trial and sentenced defendant to death. The appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Defendant contends that the verdict is not supported by the evidence. He also assigns as prejudicial error the court's excusing four prospective jurors on the ground that they entertained conscientious opinions that would preclude their voting for the death penalty, the admission into evidence of certain photographs, the refusal of the trial court to give requested instructions, and certain allegedly improper statements of the court and the district attorney.

Defendant is 23 years old and at the time of the crime was home on leave from service in the Army. The deceased, Mrs. Minnie McDonald, lived with her daughter, Mrs. Nora Inglet, in Modesto, California. Mrs. Inglet is 54 years old. Mrs. McDonald was 84 years old and was in good health for her age. Mrs. Inglet met defendant in a tavern in December, 1955 or January, 1956. The two were introduced by defendant's sister. Thereafter Mrs. Inglet saw defendant on various occasions, usually in the company of friends, but several times defendant and Mrs. Inglet were alone in defendant's car. Defendant testified that he had been intimate with Mrs. Inglet, but she denied that and testified that the last time she was alone with him, defendant attempted to force her to commit an unnatural sex act and that she left him and took a taxi home.

On the afternoon of March 19, 1956, defendant and his brother, Lester Cheary, left their mother's home in Modesto and made a tour of several taverns. They traveled in defendant's car, and defendant did the driving. They drank beer at each of the taverns they visited, and defendant testified that he also drank whiskey. They had nothing to eat. Sometime during the afternoon or evening defendant made a remark about going to see a girl. At about 1 a. m. on the morning of March 20, defendant and his brother left Jim's Place, a tavern on highway 99, and drove to the home of Mrs. Iris McCurdy. Mrs. McCurdy was acquainted with defendant and was a friend and neighbor of Mrs. Inglet. Defendant stopped his car at a point across the street from Mrs. McCurdy's residence. Lester Cheary remained in the car. Defendant got out of the car and went to Mrs. McCurdy's residence. He knocked on the door, and when Mrs.

McCurdy answered, he identified himself. He first asked for the address of J. Reynolds, a friend of Mrs. McCurdy. Mrs. McCurdy gave him Mr. Reynolds' address. Defendant then asked for Nora Inglet's address. Mrs. McCurdy refused to give him Mrs. Inglet's address. Defendant then went next door to the residence of Horace Smith. Mr. Smith told him that Mrs. Inglet lived farther down the street. Meanwhile, Mrs. McCurdy telephoned Mrs. Inglet and told her that defendant was looking for her and that he acted as if he had been drinking. After leaving the Smith residence, defendant proceeded to the next house on the block and started knocking on the door. This was the house in which Mrs. Inglet and Mrs. McDonald lived. Mrs. Inglet did not go to the door immediately, but when the knocking continued, she went to the door and asked defendant what he wanted. Defendant said that he wanted to talk to her and demanded entry. Mrs. Inglet refused to open the door and told defendant that if he did not go away she would call the police. Mrs. Inglet attempted to telephone the police, but before she could complete the call, defendant forced open the locked door and grabbed her by the arm. She dropped the telephone receiver, broke loose from defendant's grasp, and ran screaming out the rear door of her house to the home of Mrs. McCurdy. She could not telephone the police from there because the McCurdy phone was on her party line and she had not replaced her own telephone receiver. Mrs. McCurdy's son, Bob, ran to the Smith residence and telephoned the sheriff's office. Two officers in a patrol car arrived shortly thereafter, and one of the officers, Mrs. Inglet, and Mrs. McCurdy entered Mrs. Inglet's home.

They found Mrs. McDonald lying on her bed. Her face was bloody. Her bed covers were down to her waist, and her gown was open to below her .breast. The spring of her bed had fallen to the floor. Defendant stood nearby. He was bent over toward Mrs. McDonald. His trousers were unbuttoned, and he held them with hands covered with blood. The front and upper back of his trousers and his shorts were stained with blood, which was later found to be of the same blood group as Mrs. McDonald's. Defendant's shoes were under one dresser, his jacket on another.

Defendant was taken into the living room, handcuffed, and seated on a chair. Another officer entered with Lester Cheary whom he had found across the street from Mrs. Inglet's home. When he saw his brother, defendant asked,

"What are you doing here?" Defendant then said to the officers, "He didn't have anything to do with it, I did it." Bob McCurdy then entered the room. He said something to defendant, and defendant asked Bob who he was. Defendant had met Bob McCurdy on several occasions previously.

Defendant and his brother were then taken by the officers to the sheriff's office. En route defendant remarked that "According to military law, as long as the girl was over 16 years of age, there is nothing that could be done to him." Defendant testified that after he had been taken to the sheriff's office, he was told to wash his face with cold water and that one of the officers walked him up and down in front of the sheriff's office to keep him awake.

Mrs. McDonald was taken to a hospital. An examination revealed that her face was badly bruised, her nose and cheek bone were broken, and that her tongue was nearly severed from her mouth. After emergency treatment, she was placed in an oxygen tent.

At about 6:15 p.m on March 21, Mrs. McDonald died. After embalmment her body was examined by a pathologist. He found many bruises about her face, head, and neck, a large bruise on her chest, three fractured ribs, a bruise on her groin, and three small semicircular depressions on her thigh. He found no evidence of rape. He concluded that her death was caused by hypostatic pneumonia resulting from her injuries.

Defendant testified that he was intoxicated and that he did not remember anything that happened between the time he left the tavern and the time he was handcuffed in Mrs. Inglet's living room. He further testified that he did not remember anything about the drive from Mrs. Inglet's residence to the sheriff's office. Lester Cheary testified that he had paid for the drinks for defendant and himself; that he had spent about 30 dollars for drinks during the course of the evening; and that defendant had been drinking more heavily than he had. Bob McCurdy testified that defendant repeated himself and acted as if he were drunk or drugged. Mrs. McCurdy testified that defendant acted as if he had been drinking. The arresting officer testified that he thought defendant had been drinking but that defendant had no difficulty speaking and did not stagger or sway when he walked. Mr. Smith testified that defendant did not act drunk when he asked for Mrs. Inglet's address.

In his argument to the jury the district attorney explained

that he did not contend that Mrs. McDonald's death was a deliberate and premeditated homicide. He urged that defendant was guilty of first degree murder on the grounds that Mrs. McDonald's death resulted from injuries inflicted upon her by defendant in an attempt to rape her or in the perpetration of a burglary, breaking and entering Mrs. Inglet's home with intent to rape Mrs. Inglet.

■ Defendant correctly points out that to prove him guilty of first degree murder on either of these grounds it was incumbent upon the prosecution to prove that he had the specific intent to rape when he entered Mrs. Inglet's home or that he had the specific intent to rape when he assaulted Mrs. McDonald.

■ Defendant contends that the evidence establishes that he did not have the intent to rape Mrs. Inglet when he went to her home. He points to his testimony that he had been intimate with Mrs. Inglet and asserts that that testimony shows that he had reason to expect that Mrs. Inglet would admit him to her home and that he had no felonious intent when he knocked at her door. Mrs. Inglet, however, denied having had intimate relations with defendant. Moreover, whatever was defendant's original intent, the jury could reasonably infer from his forcing open the door and grabbing Mrs. Inglet after having been informed by her that he was not welcome that defendant then had the specific intent to rape.

Defendant contends that the evidence establishes that he was so intoxicated that he did not have the specific intent to rape either Mrs. Inglet or Mrs. McDonald. ■ It is true that if defendant was so intoxicated that he did not have the specific intent to rape, he is not guilty of murder in the first degree. (*People* v. *Burkhart,* 211 Cal. 726, 731 [297 P. 11]; see *State* v. *Vanasse,* 42 R.I. 278 [107 A. 85].) Whether defendant was so intoxicated, however, was a question for the jury. (*People* v. *Burkhart, supra.*) ■ The testimony regarding the extent of defendant's intoxication is conflicting. It appears, however, that he decided to go to see Mrs. Inglet; that he drove his car from the tavern to the residence of Mrs. McCurdy; that he identified himself to Mrs. McCurdy, asked for the address of J. Reynolds, whom he knew to be a friend of Mrs. McCurdy, and asked for Mrs. Inglet's address; that he walked to Mr. Smith's residence and asked where Mrs. Inglet lived; that he recognized his brother when he saw him in Mrs. Inglet's living

room; and that he had the presence of mind to attempt to absolve his brother of blame. Counsel for both sides argued the matter of intoxication at length, and the jury was properly instructed on the effect of intoxication. The jury's verdict necessarily implies that they found that defendant was not so intoxicated that he did not have the specific intent to rape. That determination is amply supported by the evidence.

Defendant contends that the trial court committed prejudicial error in asking the prospective jurors whether they entertained conscientious opinions that would preclude their "voting for a verdict carrying the death penalty," in allowing extensive argument on this point in the presence of the jurors, and in excusing four jurors who answered that they did entertain such opinions. Defendant urges that the death penalty was thus overemphasized and that the trial court lent its authority to the propriety of the death penalty in this case. ■ The choice by the jury between the possible punishments for first degree murder is to be made during and not before the jury's deliberation on that question. We recently held, therefore, that a juror who entertains views formulated before trial that compel him to vote for one of the two possible punishments regardless of what the evidence at the trial may reveal should be excused. (*People* v. *Riser,* 47 Cal.2d 566, 575-576 [305 P.2d 1].)

There was no error, therefore, in the court's excusing the prospective jurors in this case. Although there was some discussion of the propriety of the court's ruling, the tenor of the discussion affords no reason to believe that the death penalty was overemphasized or that the jurors thought that the court was endorsing the death penalty in this case. Moreover, the discussion was precipitated and prolonged by defendant's counsel, and he did not suggest that the discussion be conducted out of the jury's presence until it was nearly terminated.

Defendant contends that the trial court erred in admitting into evidence three photographs of the decedent's body taken after embalmment, on the ground that they were designed to appeal to the emotions of the jury. The only objection made by defendant to the admission of these photographs at the trial was that no proper foundation for their admission had been laid on the ground that the person who took the photographs had not been identified. That objection was properly overruled. The photographs were properly authenticated by the pathologist who looked at them

and testified that they accurately portrayed what he had seen. It is not necessary to authenticate a photograph that the person who took it testify or be identified. (*Berkovitz* v. *American River Gravel Co.*, 191 Cal. 195, 201, 202 [215 P. 675]; *cf. People* v. *Ah Lee*, 164 Cal. 350, 352 [128 P. 1035].) Even if defendant had properly raised his present objection, the pictures were admissible. ■ Although it is error to receive in evidence gruesome photographs of a homicide victim designed primarily to arouse the passions of the jury (*People* v. *Burns*, 109 Cal.App.2d 524, 541-542 [241 P.2d 308, 242 P.2d 9]; *People* v. *Redston*, 139 Cal. App.2d 485, 490-491 [293 P.2d 880]), such photographs are admissible when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant. (*People* v. *Reese*, 47 Cal.2d 112, 120-121 [301 P.2d 582].) ■ Whether the probative value of a particular photograph outweighs its possible prejudicial effect is a question to be resolved by the trial court in the exercise of its judicial discretion. (*People* v. *Reese, supra*, 47 Cal.2d at 120; *People* v. *Burns, supra*, 109 Cal.App.2d at 542.) ■ The photographs in question were admitted in connection with the pathologist's testimony regarding the extent of the decedent's injuries and the cause of her death, the latter being a matter disputed by defendant. The photographs are corroborative of the pathologist's testimony and help to show the extent of the decedent's injuries. Admittedly they constitute cumulative evidence, for they show the same injuries to which the pathologist testified. That fact, however, was only one among the several to be considered by the trial court. (See 4 Stan.L.Rev. 589, 590.) The photographs are not pleasant to look at, but they are not ghastly. They show the body of the decedent resting on a table in the mortuary where the pathologist made his examination. The body is covered by a sheet except for the head, neck, and center of the chest. No incisions or marks made by the pathologist in his examination are visible. We conclude that there was no abuse of discretion in the admission of these pictures.

Defendant contends that the court erred in refusing to give the following instructions requested by him:

"Normally, hitting a person with the hands or fist does not constitute murder in any degree. Therefore, in order to constitute murder, in any degree, there has to be either an intent to kill or such wanton and brutal use of the hands

without provocation as to indicate that they would cause death or serious bodily injury so as to indicate an abandoned and malignant heart.'' (Defendant's Instruction Number 31.)

"Where death was caused by acts of violence the character of the weapon used is of particular significance in determining whether the crime was committed with malice aforethought. If the means employed are of such a nature that normally they would not be dangerous to life, as where death is caused by blows of the fist, and there are no aggravating circumstances, the law will not raise the implication of malice aforethought.

"If the implement used is not likely to kill or maim, killing is manslaughter unless actual intent to kill is proved.'' (Defendant's Instruction Number 32.)

"Manslaughter is the unlawful killing of a human being without malice. One kind of manslaughter, the definition of which is pertinent to this case, is voluntary manslaughter, being that which is committed upon a sudden quarrel or heat of passion.'' (Defendant's Instruction Number 33.)

The court did not err in refusing to give these instructions. ▪ Voluntary manslaughter, the subject of defendant's instruction 33, was fully covered by the court in its instructions (CALJIC 305, 311, 311A.) Defendant's instructions 31 and 32 are directed at the difference between murder and manslaughter, particularly the element of malice aforethought. Those matters were also adequately covered in the court's instructions to the jury (CALJIC 301, 305, 308).

▪ Moreover, even if the court erred in refusing to give defendant's instructions 32 and 33, such error was not prejudicial. The jury found defendant guilty of first degree murder. As noted previously, the only ground urged by the district attorney for such a conviction was that Mrs. McDonald's death resulted from injuries inflicted upon her by defendant in an attempt to rape her or in the perpetration of a burglary, breaking and entering Mrs. Inglet's home with the intent to rape Mrs. Inglet. ▪ If in the perpetration of a burglary or attempted rape defendant inflicted injuries upon Mrs. McDonald that caused her death, he is guilty of first degree murder even if he unintentionally inflicted those injuries upon her. (*People* v. *Sutton,* 17 Cal. App.2d 561, 567 [62 P.2d 397].) It is immaterial whether he used his hands or fists or something more inherently dangerous.

 Defendant contends that the trial court committed prejudicial error in admonishing defendant's counsel in the presence of the jury. Counsel was cross-examining the pathologist. He asked whether it was not common for elderly people to be bedridden, apparently in an attempt to show that the decedent might have been suffering from hypostatic pneumonia before being injured by defendant. The district attorney objected to the question on the ground that it was irrelevant and immaterial. The court overruled the objection, commenting, however, that the question was ''pretty broad.'' Counsel for defendant attempted several times to explain the reason for his question, but the court refused to permit the explanation, stating, ''I've ruled in your favor, Mr. Hancock, but I will state that I think you are getting into a pretty broad field.'' Counsel said, ''I don't think I am.'' The court then said, ''Well, I'm giving you a little admonition here. I want to give you every chance to cross-question this witness, but there's some limit we can't go beyond.'' Counsel for defendant immediately replied that he did not appreciate admonishment from the court when he did not deserve it. The court then stated, ''In the last analysis, I'm going—I'm the one that's going to run this court.'' Defendant contends that since the court criticized defense counsel, the jury, which looks to the court for guidance, must have looked with skepticism upon the further efforts of the defense counsel. The court's remarks, however, were not inappropriate (see *People* v. *Knocke,* 94 Cal.App. 55, 60 [270 P. 468]), and we do not believe that they brought defense counsel into disfavor with the jury or worked to the prejudice of defendant. Indeed, before instructing the jury, the trial court explained to the jurors that in a case like this the attorneys are necessarily under great pressure and complimented both attorneys on the manner in which they tried the case.

 Defendant contends that both the trial court and the district attorney were guilty of prejudicial misconduct in implying that defendant had an unsatisfactory military record. Defendant's counsel asked defendant, ''How long have you been in the Army?'' The district attorney objected that it was immaterial. The court commented that ''strictly speaking it probably is.'' The district attorney then added, ''His military record has nothing to do unless he wants to give his entire military record.'' Defense counsel replied

that he thought "the jury might be interested in learning some of his background." The district attorney then made the following statement, which defendant cites as prejudicial misconduct, "Yes, *if you bring out his entire military background, yes.*" (Italics added.) Defendant's counsel immediately pursued the subject by asking the district attorney, "Do you know anything about his military background?" The court interrupted with the comment, "Just a moment." Defense counsel then stated, "I'll assign his last statement, the district attorney's as prejudicial misconduct and instruct—and ask that the Court instruct the jury——" The court then instructed the jury to disregard the last statement by the district attorney, and added the comment to defendant's counsel that "I think it's true, that if this man's military record is going to be put before the record, the district attorney would have an opportunity to cross-question him—to cross-examine him on it." Defense counsel did not claim that this was an incorrect statement of the law but stated that he would withdraw the question if the court wished. The court then made the following statement, which defendant now cites as prejudicial error, "Well, so there is no question about any of the rights of the defendant being infringed, I'll allow that question and the answer to that, but any further than that, why—as I say, *of course, the matter will be subject to cross-examination and can't help be brought out.*" (Italics added.) Defendant's counsel did not object or take exception to this statement, and defendant answered the question, saying, "Yes, I've been in the Army six years." There was no attempt to elicit any information concerning defendant's military record during cross-examination or to introduce such evidence at any other time.

The district attorney's insinuation that defendant's military record was unsatisfactory was improper (see *People* v. *Anthony,* 185 Cal. 152, 158 [196 P. 47]), and the trial court correctly admonished the jury to disregard the district attorney's statement. In view of the court's admonition, we do not believe that defendant was prejudiced by the statement of the district attorney. Unfortunately, the later comment by the trial court contained an implication similar to that in the district attorney's statement and was therefore likewise improper. Coming such a short time after its admonition to disregard the district attorney's statement, how-

ever, the court's statement was almost certainly inadvertent, and as noted previously, the court's attention was not called to the implication in its statement. ██ A claim of misconduct on the part of the trial court will ordinarily not be considered on appeal unless the party who complains has given the trial court an opportunity to correct the error or false impression. (*People* v. *Amaya,* 40 Cal.2d 70, 78 [251 P.2d 324] and cases there cited.) ██ Nevertheless, in view of the serious nature of the offense of which defendant has been convicted we have considered the trial court's statement. Upon reviewing the whole record, however, we are convinced that the court's statement was not prejudicial to defendant.

██ Defendant contends that the district attorney committed several acts of prejudicial misconduct during his argument to the jury. When he was summarizing the testimony of the pathologist regarding evidence of rape, the district attorney stated that the pathologist "was unable to determine whether there had been any intercourse with Minnie McDonald." Counsel for defendant objected and termed this statement a "deliberate misquotation." The court stated that any misquotation did not appear deliberate, although it was possible that the district attorney's summary of the testimony was not accurate. Then, after the district attorney urged that his remarks be struck from the record, the court ordered the remarks stricken and admonished the jury to pay no attention to them. The district attorney then said, "Well, ladies and gentlemen of the jury, your recollections are sufficient to recall what the doctor testified to, Dr. Purvis, in that regard." Defense counsel did not object and did not request an admonition concerning this last remark. Although this last statement of the district attorney might be interpreted as an attempt to have the jury disregard the court's admonition and accept his own misstatement as true, it is doubtful that the jury so interpreted it in view of the district attorney's previous request that his remark be struck from the record. In any event, neither this remark nor the original statement of the district attorney was prejudicial. The court informed the jury that the district attorney's summary of the pathologist's testimony might not be accurate, and later the defense counsel, during his own argument, quoted the actual statement of the pathologist, "I found no injuries about the pelvic area. The opening of the vagina was rather narrow and I saw no evidence of any marks."

Defendant points out that the district attorney again misstated the evidence when he asserted that Mrs. McCurdy had testified that defendant was pulling up his trousers when she entered the bedroom. Mrs. McCurdy actually testified that ''he was holding his pants.'' Mrs. McCurdy's testimony was fresh in the minds of the jurors, since the trial lasted only a few days. It is unlikely, therefore, that the district attorney's statement misled the jury. Moreover, defendant did not object to this statement at the trial.

Although he concedes that the district attorney could present to the jury his theory of the case based upon inferences reasonably drawn from the evidence (*People* v. *Burwell*, 44 Cal.2d 16, 39-40 [279 P.2d 744]), defendant contends that, during his argument to the jury, the district attorney drew two inferences that find no support in the evidence. The first inference was that defendant was pulling up his trousers when Mrs. Inglet, Mrs. McCurdy, and the arresting officer entered the bedroom. This inference was a reasonable one. It was uncontroverted that defendant's trousers were unbuttoned; Mrs. McCurdy testified that he was holding his pants; and there were blood smears on the back and top of defendant's shorts and trousers, which could have been caused by defendant's pulling up his pants with his hands, which were covered with blood. The second inference was that defendant ''reached over underneath the blankets and underneath her [Mrs. McDonald's] nightgown and grabbed her by the leg and at the same time crawling on the bed. . . .'' This inference was also a reasonable one. There were marks on Mrs. McDonald's thigh that could have been made by defendant's fingernails, and her bed spring could have been knocked down by defendant in climbing onto the bed.

Two statements made by the district attorney during his argument to the jury are cited as gross misconduct on the ground that they were inflammatory in nature. Although defendant did not object to either statement at the trial, we have examined them and find no error. One was the district attorney's reference to ''the pure, killing horror of the situation.'' He was speaking of the situation when Mrs. Inglet found that the McCurdy telephone would not function and she could not summon the police to aid her mother because she had not replaced her own telephone receiver. The district attorney's description of this situation was not

unreasonable. The other allegedly inflammatory statement was that defendant "didn't care who [his victim] was as long as he satisfied that monstrous lust of his." Such an inference could reasonably be drawn from the evidence.

Defendant contends that the district attorney's summary of the requirements of rape was prejudicially erroneous. The district attorney stated that "the specific intent which is involved is the intent to have sexual intercourse." When defendant objected, the court stated that it would instruct the jury as to the elements of the offense at the proper time. The court added that the district attorney's statement was "not out of line," but when defense counsel pointed out that the district attorney implied that one cannot intend sexual intercourse without intending rape, the court ruled that the remark of the district attorney was improper. Later, the court charged the jury that counsels' statements as to the law were not to be relied upon by the jury, and the court gave correct instructions on the law of rape. In this light, the misstatement of the district attorney was not prejudicial misconduct.

Defendant also cites as prejudicial misconduct the district attorney's statement as to the law of burglary and felony murder. The district attorney argued: "If the defendant broke in that front door with the intent to rape Nora Inglet, he is guilty of Murder in the First Degree. If at the time he smashed in the front door, when he crossed that line, he had committed a burglary; and the killing was done in the perpetration of burglary, in carrying out the act, and he's guilty of Murder in the First Degree if you want to accept that." We find in this argument no misstatement of the law. Moreover, the court admonished the jury not to rely on the statements of counsel as to the law and gave appropriate instructions concerning burglary and murder.

The final citation of misconduct concerns a statement of the district attorney during his argument to the jury that counsel for defendant had not requested an acquittal because he did not wish to insult the intelligence of the jury. Counsel for defendant immediately entered a vigorous objection. After first noting that some remarks of defense counsel could be interpreted as the district attorney argued, the court admonished the jury to disregard the district attorney's statement. In view of the vigorous objection by defense counsel and the admonition by the court, it is

improbable that the jury was misled by the district attorney's statement into believing that defendant himself lacked faith in his defense to the charge of first degree murder.

The judgment and order denying a new trial are affirmed.

Gibson, C. J., Shenk, J., Schauer, J., Spence, J., and McComb, J., concurred.

CARTER, J.—I dissent.

I cannot agree that the evidence is sufficient on which to predicate a verdict of murder of the first degree under the law of this state. We are not here interpreting or applying the law of Moses—"whoso sheddeth man's blood, by man shall his blood be shed." (Gen. IX.6.) "And thine eye shall not pity; but life shall go for life, eye for eye, tooth for tooth, hand for hand, foot for foot." (Deu. XIX.21.)

We are interpreting and applying the law of California. Under our law every homicide is not murder and every murder is not of the first degree. First degree murder is defined in section 189 of the Penal Code as follows: "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree; and all other kinds of murders are of the second degree."

As correctly stated in the majority opinion the only theory upon which the homicide here could be held to be murder of the first degree is, that it was committed in an attempt to perpetrate burglary or rape. From an examination of the record there appears to be little doubt but that defendant was intoxicated beyond a point where he did not know or appreciate what he was doing. But conceding that the evidence was sufficient to support the implied finding of the jury that he was not intoxicated, I am convinced that the evidence was not sufficient to give rise to an inference that he intended to perpetrate rape on either Mrs. Inglet or Mrs. McDonald. In my opinion the only rational conclusion to be reached from the record in this case is that defendant while in a drunken stupor perpetrated the sordid acts which resulted in the death of Mrs. McDonald. It was a ghastly and terrible crime, unprovoked and unjustified from any point of view, but I am unable to reach the conclusion from the record before us that it falls within the definition of

murder of the first degree as defined in the above quoted section of the Penal Code. (*People* v. *Kelley*, 208 Cal. 387 [281 P. 609] ; *People* v. *Tubby*, 34 Cal.2d 72 [207 P.2d 51].)

For the foregoing reasons I would reduce the degree of the crime to that of murder of the second degree.

Appellant's petition for a rehearing was denied May 8, 1957. Carter, J., was of the opinion that the petition should be granted.