Argued June 17; affirmed July 28; rehearing denied
September 15, 1931

# STATE *v.* KINGSLEY
(2 P. (2d) 3, 3 P. (2d) 113)

*T. J. Enright* and *E. E. Kelly,* both of Medford (H. K. Hanna, of Medford, on the brief), for appellant.

*George Codding,* District Attorney, of Medford (George Neilson, Deputy District Attorney, of Medford, on the brief), for the State.

BROWN, J. From the record, we gather the following undisputed facts:

At the time Prescott was slain he was a traffic officer of the city of Ashland, engaged in the performance of his duty by taking the defendant into custody. The testimony shows beyond peradventure that the defendant was a fugitive from justice, armed with a deadly weapon, and that he was speeding southward through the state; that when the officer saw the rapidly moving car passing through Ashland he gave chase and overtook the defendant, who finally stopped, and, when informed by the officer that it was necessary to take him back to the station, resisted, drew his gun, and shot the officer dead by firing three shots into his body, killing him almost instantly. Soon, thereafter, the defendant abandoned his car and was arrested. He made what the record shows to be a free and voluntary confession that was reduced to writing and signed by him, in which he freely admitted that he slew the officer by firing three shots into his body. This written confession contained much incompetent matter, and counsel for defendant in the first instance objected to its reception as evidence, but later withdrew their objection and said:

"We would like, if Your Honor please, to have you instruct the jury that we have withdrawn our objection to it (the written confession), and that we voluntarily agree that it may be admitted to the jury."

Furthermore, the defendant, when a witness in his own behalf, related the sordid history of his life, as set down in his written confession, from childhood to the time of the commission of the crime in the case at issue. In his appeal to the jury for mercy, he painted his childhood days with unhappy surroundings, which, in all probability, had a share in shaping the career of this unfortunate young man.

■■ The first alleged error before us for review relates to the denial by the court of the defendant's motion for change of venue. The defendant omitted to allege, as required by subdivision 5 of section 1-404, Oregon Code 1930, that his motion was not made for the purpose of delay. But, assuming that the motion does meet this requirement, the granting of such motion ordinarily rests in the sound discretion of the court; *State v. Pomeroy*, 30 Or. 16 (46 P. 797) ; *State v. Humphreys*, 43 Or. 44 (70 P. 824) ; *State v. Armstrong*, 43 Or. 207 (73 P. 1022) ; *State v. Smith*, 47 Or. 485 (83 P. 865) ; *State v. Brumfield*, 104 Or. 506 (209 P. 120). Moreover, the examination of the jurors tends to show that there was little or no difficulty in filling the box with twelve unprejudiced triers of facts. As measured by the cases above cited, the court did not err in denying the motion for a change of venue.

■ Dr. F. G. Swenedberg, whose qualifications as a physician and surgeon were admitted by the defense, and who examined the body after the killing, testified, among other things, as to the direction taken by the leaden balls after entering the body. He testified that one of the bullets struck the officer in the arm, another in the middle of his back producing a terrific hemorrhage and severing large blood vessels within the abdominal cavity, and that the other entered the back of the neck and lodged beneath the right eye. Relating to the admissibility of this testimony, we note the following from Wharton on Homicide (3d Ed.), § 607:

"The condition of the body of the person killed * * * with reference to the number and character of the wounds inflicted, is competent and sometimes cogent evidence in a prosecution for the killing."

There is nothing in the record tending to show that this surgeon testified to any matter that was incompetent, and his testimony was admissible under the indictment.

■ Nor was error committed in admitting the testimony of the chief of police of the city of Ashland to the effect that the deceased officer was in the performance of his duties at the time he was slain.

In his brief the defendant says:

"The indictment does not charge the defendant with either resisting arrest or having shot an officer when such officer was in discharge of his duty."

■ It is not necessary that the indictment in a homicide case allege that the deceased was an officer, or that the defendant was resisting arrest. See *State v. Lockwood*, 126 Or. 118 (268 P. 1016), where we held:

"Subdivision 6, section 1448, Oregon Laws, provides that the indictment is sufficient if 'the act or omission charged as the crime is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended.' Finally, an indictment drawn in the language of the statute, which defines the crime, is sufficient to meet the requirements of the Constitution and the Code." (Citing numerous local authorities.)

■ Counsel for the defendant assert that the reception in evidence of certain articles of clothing and the revolver that was on the person of the defendant at the time of his arrest (known to the record as Plaintiff's Exhibits 5, 6, 7 and 8) was prejudicial to him. We cannot follow counsel. The defendant himself, upon the witness stand, testified as to his ownership and disposition of these exhibits; and, in view of this fact, it is unnecessary to discuss the admissibility thereof. But,

in any event, the clothing worn by the person killed or by the accused may be introduced in evidence in a prosecution for the killing, whenever it may in any way aid in explaining or determining any disputed question in connection therewith. Wharton on Homicide (3d Ed.), § 610.

■ The defendant assigns error of the court in permitting Deputy District Attorney Neilson, in his opening argument on behalf of the state, to refer to the defendant as being "as cold-blooded as a rattlesnake", and to call him a "cold-blooded murderer"; and further, in allowing him to state, in an attempt to explain his use of the foregoing language: "I have a personal hatred against this man." This is not the language that usually characterizes a quasi-judicial officer, particularly in a case where a man is on trial for his life. Personal hatred should neither impair, control, nor affect the administration of justice. However, we do not think these utterances so prejudiced the jury as to require a reversal of this case.

■ It is alleged that the court erred in sending to the jury room the written confession made by the defendant. This entire statement was read to the trial jury, it was commented upon by opposing counsel, and it was admitted into the record as evidence not only without objection but with the express consent of the defendant. Further, the defendant fully testified to the matter as set down in his written confession. By reason of these facts, error was not committed. In this connection, we direct attention to the case of *State v. Hatcher*, 29 Or. 309 (44 P. 584), where this court held that the erroneous ruling of the trial court in admitting into the record a preliminary statement made by the accused on a criminal prosecution for homicide is

cured where the defendant subsequently testifies to the same state of facts set forth therein. In support of this view, there is an abundance of authority.

■ Alleged error No. 6 presents the only difficult situation. By this assignment the defendant asserts that the court erred in permitting the district attorney to travel out of the record in his closing argument to the jury. In this contention we concur. But his departure from the record involved no facts tending to show the guilt of the defendant, and, for this reason, the case presents a different situation from that shown by the facts in the case of *State v. Hatcher,* 29 Or. 309 (44 P. 584), cited by the defendant. See, also, *Tenny v. Mulvaney,* 8 Or. 513; *Huber v. Miller,* 41 Or. 103 (68 P. 400), 54 Cent. L. Jr. 429; *Marshall v. Olson,* 102 Or. 502 (202 P. 736).

A person on trial for the commission of the crime of murder, however gross his crime, is entitled to a full, fair presentation of his case in all courts where it is considered. As to what constitutes proper argument of counsel in prosecuting a case of homicide, Kerr, in his valued work on the Law of Homicide, thus expresses his view, at section 305:

"The province of counsel in argument is to state to the jury the case and the facts pertaining thereto, and to sum up before them the evidence; and where the prosecuting counsel exceed this, go beyond proof relating to the case, and the hypothesis upon which the prosecution is based, in order to create a prejudice in the minds of the jury against the defendant, and the court makes no attempt to counteract any effect which such action may have, the defendant does not receive an impartial trial, which is guaranteed to him by constitutional provision."

In 2 Thornton on Attorneys at Law, at section 712, the author treats the subject of "Conduct of Trials" by a prosecutor as follows:

"The prosecuting attorney is a quasi-judicial officer, and he and those associated with him should represent public justice exclusively, and stand indifferent as between the accused and any private interest; indeed, it has been said that it is as much the duty of prosecuting attorneys to see that the accused is not deprived of any constitutional or statutory rights, as it is to prosecute him for the crime with which he is charged. The district attorney represents the state, and the state does not seek victims—it seeks only equal and impartial justice; and the prosecutor should not press upon the jury any deductions from the evidence that are not strictly legitimate. When he exceeds this limit, and seeks to influence them by appealing to their prejudices, he is no longer an impartial officer, but a partisan."

With relation to the same matter, Weeks on Attorneys at Law (2d Ed.), at section 282a, says:

"The prosecuting attorney is a sworn minister of justice, whose duty it is to see that the innocent are protected, as well as that the guilty are brought to punishment, and who must stand indifferent as between the accused and any private interest."

In 1 New Trial and Appellate Procedure, Spelling, at section 92, the author states that "courts look with * * * disfavor upon assertions by counsel in argument at the trial of facts, material to the issue, but not in evidence." To like effect is 1 Thompson on Trials (2d Ed.), § 963. See, also, section 966 of the same work for "Instances of Reversals," and for "A Catalogue of Prejudicial Statements" see section 976 thereof.

Now conceding, as we must, that the prosecuting attorney and his representative went beyond the fair

limits of debate in closing the case for the state, does such action warrant a reversal of this cause? In the view of the writer, a determination of this question properly depends upon the strength of the case made by the prosecution. This doctrine is held by Mr. Kerr in his work on Homicide, at section 305, and it is supported by a multitude of authorities cited in note 2 thereof. That section reads:

"The criterion as to the reversal for erroneous remarks of prosecuting counsel is always the question whether such remarks or statements probably had the effect of working to the prejudice of defendant with the jury."

Concerning the same subject, we take the following from 2 Hyatt on Trials, section 1515:

"The court may disregard improper argument and affirm a just judgment on appeal. A verdict amply sustained by unobjectionable evidence should not be reversed because of an improper remark of counsel in argument, however objectionable. There is no presumption that such improper language of counsel entered into the verdict, which was amply sustained by such evidence. It cannot be said that any prejudicial effect flowed from improper argument when the verdict is obviously supported by the evidence."

Continuing, at section 1516, the author writes:

"Actual prejudice is essential to authorize reversal because of improper argument. As stated in the preceding section, a righteous verdict is not disturbed on this ground.  *  *  *"

For further authority, see 1 Thompson on Trials (2d Ed.), §§ 987, 988, and 2 Michie, Homicide, p. 1795.

Were the instant case one built upon doubtful circumstances, and supported by the testimony of questionable witnesses, our conclusion must, of necessity,

be a different one. But, from the strong degree of proof adduced, the writer does not believe that the journey out of the record by the district attorney prejudiced the minds of the jury in this case. The record clearly indicates that the unfortunate defendant was convicted, not by the prosecuting attorney's excursion beyond the limits of the record but by the strong proofs adduced by the state that established his guilt. The jury had a right to believe from the evidence, and evidently did believe, that the defendant, with deliberate and premeditated malice, killed an officer who was engaged in the performance of his duty. From the defendant's confession, corroborated by ample evidence, he deliberately and maliciously shot to kill, and did kill.

It has been asserted that to hold it error for the prosecutor to follow the defense out of the record in his closing argument to the jury will hamper the future prosecutor in the presentation of his cause. To this we answer: Every case should be tried upon the facts within the record; and the careful prosecutor will not depart therefrom. In the administration of his duties, this important officer is not justified in violating the rules of practice because of the breach thereof by the defendant or his representatives. His case is made on the evidence of record and the law applicable thereto; and the vindication of justice does not require or contemplate an excursion beyond the limitations of the record.

As a fitting conclusion to what we have written, we refer to the case of *O'Kelly v. Territory*, 1 Or. 51, decided by this court nearly eighty years ago in a masterly opinion by Mr. Chief Justice WILLIAMS. It was a case of murder, and in the defense, technicalities

arose. In the course of the opinion, the great jurist declared that laws were made to prevent crime, and that their enforcement by the courts was a duty as plain as it was painful. Continuing, he said:

"Time was when the unfortunate accused was dragged to trial without counsel, or a fair chance for self-defense. Then other rules prevailed, and courts tried to make technicalities the means of justice; but, when prisoners come before our courts with more privileges and presumptions in their favor than they otherwise could have, these olden rules cease with the reasons on which they rested, and criminals cannot be allowed to take refuge from the judgments of our liberal laws in the cobwebs of an antiquated practice."

This case should be affirmed. It is so ordered.

BEAN, C. J., BELT and CAMPBELL, JJ., concur.

RAND, J., dissents.

---

ROSSMAN, J. (specially concurring). I concur in all of the foregoing except the process of reasoning employed by my associates in reaching their conclusion that no reversible error was committed when the court permitted the district attorney to advance the challenged argument. I agree with the result reached by the majority, but do so by a different process of reasoning which does not subscribe to the doctrine that when the attorney for the defendant departs from the record the district attorney must stay within it; rather, I am of the opinion that the act of the defendant's attorney in going outside of the record, over the objection of the district attorney, is an invitation for the other to do likewise. A brief reference to the incidents which occurred during the argument is deemed necessary. While the court was endeavoring to define the bounds within which the

argument must be confined, defendant's counsel, in the presence of the jury, addressed the court, thus: "If Your Honor please, I view this in this light: the legislature has seen fit to give to the jury and place in their hands the power of life and death. Now, we have come into court here and we have put ourselves upon the mercy of this jury just the same as if we had entered a plea of guilty to Your Honor, and we feel that having thrown ourselves upon the mercy of the jury here, we should have the full right to make the same plea we would make to Your Honor." To which the presiding judge replied: "As I indicated before, I don't want to use the term 'plea for mercy' until you use it." Defendant's counsel replied: "That is the plea I am going to make."

The certificate of the trial judge, attached to the Bill of Exceptions, states that defendant's counsel employed the following subject-matter in his argument to the jury:

"Defendant's counsel thereupon proceeded to make a plea to the jury for mercy based upon various considerations appearing in the evidence in the case, and defendant's counsel in the course of his plea referred to various cases where persons actually guilty of murder in the first degree had received life sentences and argued inferentially that the jury was entitled to take such matters into consideration, and that the defendant in this case should not receive more drastic punishment than others in other cases where the defendant was equally or more guilty, and also arraigned the social system and society for permitting conditions to exist whereby persons of tender years were allowed to live under conditions which have a tendency to force them into a life of crime, and argued that imprisonment for life would be an adequate and provident punishment in this particular case, and that the jury should exercise its prerogative of recommending life imprisonment."

The record indicates that the district attorney objected to the above argument and that he did not indulge in the remarks challenged by the defendant until after the above words had been spoken, and the court had ruled that our statute, which vests a discretionary power in the jury to recommend life imprisonment, even when first degree murder is proved, rendered proper the defendant's plea for mercy.

To hold that when the attorney for the defendant departs from the record the district attorney may make no reply is to confront him with a serious handicap. The authorities regard the act of defendant's attorney as an invitation to the district attorney to reply: Thompson on Trials (2d Ed.) § 987; *Pierson v. State,* 21 Tex App. 15 (17 S. W. 468); *Barczynski v. The State,* 91 Wis. 415 (64 N. W. 1026); and note in 46 L. R. A. 641 at 670.

Moreover, the defendant never obtained a ruling from the circuit court upon the propriety of the challenged argument. His counsel excepted, it is true; but merely excepting was not sufficient to obtain a review by this court for it is well established that it is the duty of opposing counsel, in order to preserve alleged misconduct in argument for the attention of this court, to obtain a ruling from the circuit court, and then, if the ruling is unsatisfactory, secure the exception. The ruling is as essential as the exception: *Watts v. Spokane P. & S. Ry. Co.,* 88 Or. 192 (171 P. 901); *Boyd v. Portland Elec. Co.,* 37 Or. 567 (62 P. 378, 52 L. R. A. 509); 2 R. C. L., Arguments of Counsel, p. 438, § 36.

But if the exception be deemed adequate, and if the argument should be regarded as improper, yet it seems to me that the challenged comment concerned facts

generally known by all people, including the jurors, and therefore nonprejudicial. Everyone knows that men escape from our penitentiary from time to time, and that prisoners committed for life rarely serve their full sentences. Four times in the interval from November, 1914, to the present time the people of this state have voted upon the subject of capital punishment. In those four elections the same facts that were seized upon by the district attorney in his challenged argument were generally employed by the voters of the state in determining the merits of the bills pending before them. For instance, a group of voters, May 21, 1920, who favored capital punishment, inserted in the voters' pamphlet, published by the Secretary of State, pursuant to law, and mailed to all voters, the following argument in opposition to the effectiveness of life imprisonment: "He is sure of humane treatment, of provision for his physical needs and has before him always the possibility of pardon, as well as of escape, * * *" The initiative bill of 1912 prohibiting capital punishment expressly limited the governor's power to pardon or parole those found guilty of homicide, and thereby brought forth as a subject of general comment the pardoning power.

The item mentioned by the district attorney that six and one-half years constituted the average term served by life prisoners was not the vital fact. The persuasive point was that which the jurors already knew: that a life prisoner was subject to pardon and parole.

The Alabama court recently had occasion to consider almost the identical problem which now confronts us: One Anderson, accused of robbery, plead insanity. The district attorney in addressing the jury spoke thus: "If you send the defendant to Tuscaloosa, in two

or three years he will be out.'' Upon the objection of the defendant's counsel, the trial judge said: ''Of course, gentlemen of the jury, argument of counsel in regard to what will be done with a man if he is committed to Tuscaloosa should have no weight with you or bearing on your verdict, because it is to be presumed the authorities there would act in accordance with what the law requires in regard to insane persons, and, of course, the argument in that record should not be considered by you, because it is improper.'' The defendant having been convicted, the argument of the district attorney was assigned to error. In holding otherwise, the Supreme Court of Alabama in *Anderson v. State*, 209 Ala. 36 (95 So. 171), held:

''We are of opinion that the argument and statements of state's counsel in the presence of the jury, making reference to escape from the asylum or to defendant's having committed other crimes distinct from that for which he was on trial, were not prejudicial, or, if so, not such as was not eradicated by prompt and explicit action of the court, admonition to counsel, and instructions given the jury.''

It will be observed that in the Alabama case the trial court's remarks, instead of nullifying the effect of the attorney's comment, strengthened it.

For the above reasons I concur in the result reached by the majority.

---

KELLY, J. (Dissenting.) The writer agrees with the majority of the court in holding that error was committed in permitting the district attorney to make a statement to the jury that in this state the average length of imprisonment under a sentence for life is but six years and a half, but is unable to concur with them in holding that such error did not influence the

jury in their consideration of the question of whether they should or should not recommend that the penalty should be life imprisonment. Obviously, this statement of the district attorney, the making of which every member, but one, of this court holds to have been error, had a strong tendency to induce the jury to withhold a recommendation of life imprisonment.

The effect of this error is not confined merely to the question of defendant's guilt. It bears gruesomely upon the question of penalty, which, under the latest constitutional mandate, must be determined by the trial jury: Section 37, Article I, Constitution of Oregon, p. 87, Oregon Code 1930. For that reason, the authorities are not in point which hold that strong evidence of guilt renders harmless the error which otherwise would be reversible.

The statement of the deputy district attorney to the effect that he had a personal hatred for the defendant should have been rebuked by the trial court, and the jury should have been instructed to disregard it.

The writer dissents from the opinion of the court.

---

Petition for rehearing denied September 15, 1931

ON PETITION FOR REHEARING

(3 P. (2d) 113)

The defendant has filed a petition for a rehearing.

In the brief for a rehearing, it is asserted:

"The defendant clearly admitted his guilt, and there was never any other issue to be determined save the issue of life imprisonment or hanging."

It is true that the defendant, in an *ex parte* confession, admitted that he killed Sam Prescott, a police officer of the city of Ashland and deputy sheriff of Jackson county, by shooting him to death on January

24, 1931, at a time when the officer was attempting to arrest him. It must be borne in mind, however, that, when called upon to plead to the charge of murder contained in the indictment, defendant entered a plea of not guilty. Under our Code, such a plea constitutes a denial of every material allegation in the indictment. Oregon Code 1930, § 13-844. So far as shown by the record, at no time during the trial did the defendant withdraw his formal plea of not guilty. In this connec-nection it is proper to note that the trial court certified as part of the record in the case, and part of the tran-script and bill of exception, the following fact:

"SIXTH: In the course of the argument by defend-ant's counsel to the jury, Mr. E. E. Kelly stated, in substance:

" 'I will say to you frankly that we will enter a plea of guilty to killing this officer without premeditation and we will submit to you the reasons why you should extend him some clemency, and ask you to give him consideration in the giving of his testimony. Of course, we claim there wasn't any legal premeditation.' "

Our statute provides that, except in case of a corpo-ration, a plea of guilty must be entered in person. Oregon Code 1930, § 13-842. Moreover, it is plainly apparent that counsel had no intention of pleading guilty to murder in the first degree, because he ex-pressly excluded from his alleged plea the charge of premeditation contained in the indictment.

Upon the defendant's plea of not guilty an issue of fact arose; and before a conviction could be had, it was necessary for the state to establish each material allegation contained in the indictment to the satisfaction of the trial jury beyond a reasonable doubt.

The record herein tends to establish premedi-tated malice on the part of the defendant. We note the

testimony adduced by Mrs. L. F. Batchelor, an important eyewitness, who testified that, early on the morning of the homicide, she went to Ashland, and that, upon her arrival at a Standard Oil service station there, she stopped and asked for a road map. Her testimony continues:

"I saw these two cars coming along, the two cars were speeding along, coming fast, and I had to hold my boy back as you do when crossing a street and see cars coming, and first I started to stop and just had stopped, I guess, and this car let out a siren and I knew it was an officer of course; and then they drove over to the curb, drew right off in front * * *. It kind of turned and went up on the curb, the two front wheels, and then I knew something was wrong * * *. I thought I heard a back fire, and then the next I saw was the forms struggling, and it all happened so fast, and then the next saw was this officer coming out of the car backwards, running backwards, and this other man had his gun pointed right on him, and this officer was going backwards and right facing the gun, and he got his gun up something like that, and the first shot, * * * the gun went down. Then he went to turn then—he was facing toward the car and toward the man, and he turned as if he started to run diagonally across from where he was standing and the officer said, 'My God, don't!' or something to that effect, and then the next shot came and he fell down and then the next shot came when he was already down, lying on the pavement. * * *

"Q. Who was the man who did the shooting? A. The man sitting down there (indicating defendant)."

As we stated in our original opinion the defendant, when testifying in his own behalf, related the sordid history of his life; and, coming down to the time of the commission of the homicide, we here set out his story:

"I was very tired and sleepy driving all that afternoon and night, when the first thing I noticed a car drove up alongside and gave the siren. * * * I

pulled over to the side of the road and this officer came back. I rolled down my side of the glass on the door and he said: 'Have you a driver's license?' I said, 'No, I haven't.' He said, 'Have you got papers on the car?' I says, 'No, I haven't; I left them back in Portland.' He says, 'What were you doing in Portland?' I told him I was in town a few days and was going into California. 'Well,' he says, 'I have a report of a stolen car that answers this description.' He say, 'Slide over.' So I slid over and woke up the fellow that was with me. I think we crowded him over to one side too. He got into the car and backed it up and started ahead and around his car, *and all this time I was fumbling around in my pocket, trying to get out this gun.* He was backing up pretty close and he kept watching me, I suppose wondering what I was doing, but I never said anything, so after we went a few feet—I don't know how far it was—he said to me—he didn't say a word. I said to him—now I am not just exactly sure of the words I used: 'Now, behave yourself. Watch what you are doing. I don't want to shoot. Listen to reason.' I just wanted him to listen to reason. My object was to tie the officer up, put him in the back of the car, and park him out some place on the highway where I had a good chance to make my get-away, but he started wrestling with me, and fighting, and I said to this fellow: 'Why don't you help me?' And all this time my arm was up in the air and I was trying to keep the gun away from the officer, and he was reaching for his gun also, and he hurt my left hand wrestling on account of the wound, which made me kind of sore, I guess. Well, by that time we went out upon the curb, and he hadn't said anything that I know of at that time. He got out of the car, turned around and drew his gun and I shot the man in the left shoulder. Going on a little farther he started to run away. * * * I was very excited at the time, the first time I ever shot a man in my life, the first time personally I ever shot a gun at all, and I watched him for a second. * * * And he had gone about thirty feet, and turned again and had his gun out, and so I fired twice in quick succession. I saw him fall and turned around and got in the car * * *.''

324

■ The defendant seeks a rehearing principally for the reason that, in his concluding argument, the district attorney "suggested," in substance, that the average length of imprisonment under a sentence for life is but six and one-half years. This statement was not based upon any evidence of record, nor is there anything of record tending to show that it had any effect upon the jury.

It is statutory law in this jurisdiction that judgments or orders appealed from can be reviewed only as to questions of law appearing upon the transcript (Oregon Code 1930, § 13-1224), and that, "after hearing the appeal the court must give judgment, without regard to the decision of questions which were in the discretion of the court below, or to technical errors, defects, or exceptions which do not affect the substantial rights of the parties." Oregon Code 1930, § 13-1225. This provision of the Code has often been invoked.

The case of *State v. Pender*, 72 Or. 94 (142 P. 615), was a prosecution for murder. Pender was convicted of murder in the first degree and sentenced to hang. The case was appealed and one of the assignments of error there, as here, related to remarks of the district attorney. In its disposition of the case the court, in an opinion by Mr. Justice RAMSEY, said:

"Section 1626, L. O. L. [Oregon Code 1930, 13-1225] requires this court to disregard technical errors, defects and exceptions which do not affect the substantial rights of parties. It is not necessary to decide whether the admission of said evidence was error, as we hold that it did not affect the substantial rights of the defendant.

"The defendant asserts also that the case should be reversed because the district attorney, who tried the case in the court below, in his argument to the jury, went out of the record and made objectionable refer-

ences to one of the witnesses for the defendant. The defendant failed to mention this in his assignments of error. The remarks are as follows:

" 'There is Craddock, the man who owes his job and his position to Logan, but what does this man Craddock say?'

"Counsel for the defendant objected to said remark and asked the court to instruct the jury to disregard it. The district attorney then said:

" '* * * But it seems that after this man Craddock had been here upon the stand Saturday, and had so glibly testified to facts as he called them here, he went back to Portland in company with Logan and in company with another of Logan's clients that he just kept out of the penitentiary. They went to do a little experimenting.'

"This also was objected to. Some of the remarks of the district attorney were improper.

"In the argument of cases, district attorneys have no privileges that other counsel have not. It is their duty to keep within the facts testified to, and not to permit their zeal to carry them beyond their limits as counsel, and it is the duty of trial courts to keep all counsel within proper limits. Trial courts are armed with ample power to do so. When counsel step beyond the facts of the case in their arguments, trial courts should stop them and compel them to desist, and, if they state any facts not in evidence, the court should instruct the jury to disregard them.

" '* * * We think that the remarks made by counsel and objected to were improper, but that they were not prejudicial to the defendant, and that we have no right to reverse the judgment on account thereof.' '

The judgment of the lower court in that case was affirmed.

To like effect, see *State v. Garrett,* 71 Or. 298 (141 P. 1123), *State v. Goff,* 71 Or. 352 (142 P. 564), *State v. Selby,* 73 Or. 378 (144 P. 657), *State v. Leonard,* 73

Or. 451 (144 P. 113, 681), and *State v. Yee Guck,* 99 Or. 231 (195 P. 363). For further cases, see notes to section 13-1225, Oregon Code 1930.

From 2 Ency. Pl. & Pr., 732, 733, we quote the following excerpt:

"Where the attorney for the losing party is the aggressor in matters of this kind, thereby challenging a reply from his opponent, the court will not punish the prevailing party by granting a new trial for an indiscretion thus committed by his counsel, unless it appears quite plainly that the verdict was influenced by such remarks."

The brief of the defendant contains an eloquent plea for mercy. However, counsel for defendant have failed to cite a single additional authority or text in support of that plea. The defendant has been indicted, tried, and convicted of the crime of murder in accordance with law. We have again read the record of his arraignment, trial, and sentence as a result thereof, and we are convinced that the verdict returned into court by the jury was reached from an analysis and consideration of the strong proof made by the state and corroborated by the defendant. The jury knew from the record that Prescott was armed for the purpose of executing the law, and that he was shot by the defendant when, in pursuance of his duty, he undertook to place him under arrest. Furthermore, the record shows that the defendant was armed to the teeth with two deadly weapons for the express purpose of defying the law and its representatives. He was armed for the purpose of carrying on his unlawful conduct. He shot to free himself from the clutches of the law. There is evidence tending to establish that he purposely and with deliberate and premeditated malice shot and killed a representative of the law that he might escape pun-

ishment. The trial jury heard the earnest plea of the defendant's counsel for mercy, and, despite that fact, returned a verdict of guilty without recommendation. Nor was there any mercy in the heart of the defendant at the time the officer was shot down by him. There is testimony of record that, following the first shot fired by the defendant, the officer exclaimed, "My God, don't!" The answer was a second shot that felled the officer to the pavement, followed closely by a third which was fired by defendant into the fallen body of the dead or dying man. This is the testimony of the atrocious crime upon which the verdict of the jury was based.

We are not convinced that the record of the trial of this case indicates that the verdict of the jury was the result of a prejudicial argument by the district attorney. The petition for a rehearing will be denied.