Argued June 6, affirmed September 19, petition for rehearing
denied October 16, 1962

# STATE OF OREGON *v.* FREEMAN

### 374 P. 2d 453

*William M. Holmes,* Bend, argued the cause for appellant. With him on the brief was Cash R. Perrine, Bend.

*John M. Copenhaver,* Special Deputy District Attorney, Redmond, argued the cause for respondent. With him on the brief was Warren H. Albright, District Attorney, Madras.

Before MCALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and LUSK, Justices.

GOODWIN, J.

A jury having found Jeannace June Freeman guilty of first-degree murder, without recommending life imprisonment, the judgment of death was mandatory. Oregon Constitution, Art I, § 37. The appeal is, accordingly, automatic. ORS 138.410.

On May 11, 1961, the bodies of two children were found at the bottom of Crooked River canyon in Jefferson County some 300 feet directly below a scenic viewpoint in Peter Skene Ogden State Park. Within a few days the children were tentatively identified as those of one Gertrude Nunez, of Oakland, California. On the evening of May 16, Miss Freeman and Mrs. Nunez were taken into custody by Oakland police officers. Freeman gave the Oakland police a written statement which contained admissions that tended to incriminate her. The next morning Freeman consulted an attorney from the public defender's office. The attorney advised her to remain silent and to fight extradition. She disregarded this advice on both counts.

On May 18, Freeman waived extradition and on May 20 was brought in custody to Bend, Oregon, where

she was lodged in the county jail. The next day, a Sunday, Freeman was taken before a court reporter, and in the presence of the district attorney and two police officers dictated a statement which was used at the trial. In this statement, Freeman did not admit killing either child but she did admit that she was at or near the Crooked River viewpoint at the time the children were thrown over the precipice. (At this time, and throughout all her statements, as well as at the trial, Freeman said that Nunez had thrown both children into the canyon.) Freeman apparently spent Sunday and part of Monday in the company of the police officers. She visted the scene of the crime, and told the police where the children's clothing could be found.

Nunez, meanwhile, was apparently telling the police the story she was later to tell the jury in the case at bar, i.e., that she had thrown her four-year-old daughter into the canyon and that Freeman had thrown the six-year-old boy into the canyon.

On Monday, May 22, Freeman was taken before a justice of the peace in Jefferson County and there she apparently joined in a request by the district attorney for a continuance of the preliminary examination required by ORS 133.510 et seq. The record does not reveal the date of the adjourned examination, but it must have occurred within a day or two, for on May 29 Freeman and Nunez were separately indicted for the first-degree murder of each child. The state elected to try Freeman first for the murder of the boy. Nunez pleaded guilty to the murder of the girl.

The record reveals that counsel was appointed for Freeman on June 2. After certain motions and demurrers were interposed and ruled upon, an amended indictment was filed. On September 5, 1961, the trial

commenced. It continued through September 15. The assignments of error all challenge rulings of the court in receiving certain evidence. (The appeal also concerns the legal significance of the events which occurred between Freeman's arrest on May 16 and the appointment of her defense counsel on June 2, but these questions do not involve rulings made at the trial.) We shall first consider the assignments of error.

■ Three assignments of error challenge the admissibility of testimony from medical and other witnesses concerning the condition of the body of the girl. Timely objection was made on the ground that such testimony was irrelevant under an indictment which charged Freeman with killing the boy. Freeman contends that most, if not all, the evidence about the death of the girl was prejudicial to Freeman's defense, and that the prejudice thereof outweighed any probative value such testimony might have had in her case.

It was the state's theory of the case that the killing of the two children was planned and carried out by Freeman and Nunez in order to rid themselves of the inconvenience of having small children about the premises where Freeman and Nunez were carrying on a lesbian relationship. (Freeman admitted the character of the relationship.) Nunez testified without objection that Freeman felt that the children interfered with the enjoyment of their relationship, and that the two agreed that the children should be disposed of. Nunez also testified that she and Freeman made plans to do away with the children while driving with the children from Oakland, California, to the scene of the crime.

The state contended, and the proof tended to show, that the murders were committed practically simul-

taneously; that the motive was identical in each case; that the probable cause of death was substantially the same in each case; and that the injuries which resulted in mutilation of the bodies had sufficient similarity in each case to show a common scheme.

■ The state argues that it was necessary to prove how the girl died and the events leading to her death in order to rebut possible defenses that the death of the boy might have been an accident or perhaps the result of some spontaneous or impulsive act not amounting to first-degree murder. In view of the burden placed upon the state by the indictment for first-degree murder, the duty on the part of the prosecution to produce the challenged testimony seems clear. It was not error to receive the evidence. There is no question but that the prosecution may use evidence which includes proof of other crimes if that evidence tends to prove motive or design. *State v. McDonald,* 231 Or 24, 361 P2d 1001; *State v. Wm. Clarence Schleigh,* 210 Or 191, 310 P2d 358; *State v. Reyes,* 209 Or 595, 629, 303 P2d 519, 304 P2d 446, 308 P2d 182; *State of Oregon v. Long,* 195 Or 81, 244 P2d 1033. Under all the circumstances, the evidence objected to was relevant, and, while it may have had grave consequences for the defendant, its prejudicial effect was only incidental to its probative value in meeting the burden upon the state to prove premeditation and malice.

■ Other assignments of error challenge the receipt in evidence of certain photographs of the broken bodies of the two children. Timely objection was made to each of the pictures of the boy's body on the ground that each picture was unduly gruesome. Objections were likewise made to each picture showing the girl's body. In addition to the objection that the pictures

of the girl's body were unduly inflammatory, further objection was made on the ground that the same want of relevance attributed to testimonial evidence about the girl's fate made the pictures inadmissible on that account as well. On the score of relevance, what we said about the testimonial evidence of the girl's fate has equal application to the pictures of the girl's body. The evidence was relevant to prove motive or design, and to rebut possible arguments of want of premeditation.

The principal point urged by the defendant against all the pictures is that they were so gruesome as to be inadmissible notwithstanding any relevance they might have had. There can be no doubt that the pictures must have had a profound impact upon the minds of jurors. No normal person could look at the pictures of the torn and broken bodies of the children without a swift and violent emotional reaction. It does not follow, however, that the use of the pictures by the state exceeded the permissible limits in cases of this character.

■ The general rule is that properly authenticated photographs may be received in evidence so long as they are relevant to an issue in the case. This rule is found in our own cases, e.g. *State v. Leland,* 190 Or 598, 227 P2d 785 (affirmed, *Leland v. Oregon,* 343 US 790, 72 S Ct 1002, 96 L Ed 1302) and is probably the majority rule. See Annotation, 159 ALR 1420. In California, Traynor, J., stated a qualification of the rule this way: "Although it is error to receive in evidence gruesome photographs of a homicide victim designed primarily to arouse the passions of the jury * * * [citations], such photographs are admissible when they are relevant to the issues before the court and their probative value is not outweighed by the danger

of prejudice to the defendant * * *." *People v. Cheary*, 48 Cal2d 301, 312, 309 P2d 431. In *State v. Kristich*, 226 Or 240, 246, 359 P2d 1106 (1961), we indicated that the rule of relevancy is probably not absolute, i.e., that the probative value of the evidence should outweigh its prejudicial effect. Thus the modern Oregon rule is not unlike that found in *People v. Cheary*, supra. Another variation, sometimes called the "necessity" rule, seems not to be widely followed. It requires that the gruesome exhibits be not only relevant to an issue in the case but necessary to its proof. See, e.g., *State v. Bischert*, 131 Mont 152, 308 P2d 969.

In this state, then, relevant evidence is admissible, subject to a reasonable balance between probative value and prejudice, no matter how distressing the evidence may be. With the exception of *State v. Miller*, 43 Or 325, 74 P 658, which has been treated as overruled since *State v. Weston*, 155 Or 556, 564, 64 P2d 536, 108 ALR 1402 (1937), this court has uniformly upheld murder convictions against the contention that certain evidence was unduly realistic. In *State v. Leland*, supra, we said that "[a]s long as the defendant's plea of not guilty stood, the state had the right to prove its case up to the hilt and to choose its own way of doing so * * * subject only to the rules of evidence and the standard of fair play which should govern the prosecution of every criminal case * * *." 190 Or at 630.

We adhere to the rule that it is not error to receive relevant exhibits merely because they may have a traumatic effect upon the minds of jurors. Murder is never pleasant to contemplate. It is the jury's duty, however, to examine all the evidence and from such examination to declare a true verdict. The truth may be

ugly. See *State v. Nunn*, 212 Or 546, 566-567, 321 P2d 356; *State of Oregon v. Long*, supra; *State v. Garver*, 190 Or 291, 226 P2d 771, 27 ALR2d 105.

■ There is no reason to assume that the exhibits were employed to produce prejudice for its own sake, nor that their number (14) was excessive. The number of pictures admitted was within the sound discretion of the trial court. We find no abuse of that discretion. The initial shock of the first pictures exhibited to the jury could not have been substantially increased when the jurors saw others taken from different camera positions. Whatever prejudice might have resulted from the photographs could not have been other than total and complete upon the exhibition of any one of the pictures. The trial judge is in the best position to regulate the flow of evidence. In his discretion he will ordinarily exclude that which is clearly cumulative. Unless an abuse of discretion is shown, there is no error in permitting the state to put on such evidence as it may have. It would be unrealistic to say, after a verdict, that the state must be penalized for unnecessary roughness merely because an appellate court might believe that there would have been adequate proof to support the verdict without the challenged evidence. Further, to do so would be to speculate. As a practical matter, no one knows when the jury has had exactly enough evidence to satisfy the state's burden of proof.

It must be remembered that the condition of the bodies was entirely the handiwork of the perpetrators of the crime. The pictures show the bodies exactly as they were found. Some pictures were taken at the floor of the canyon and some were taken at the coroner's place of business. In this state the same jury that tries the case also fixes the penalty for first-

degree murder. Evidence which might in the abstract seem redundant to prove that *A* killed *B* may supply important proof upon the issue of malice and the fitness of a penalty. The defendant in the case at bar was apparently willing to admit that she was an accessory to the murder, if not, indeed, a principal under ORS 161.220. There was a conflict, however, between the testimony of Freeman and Nunez whether Freeman actually killed either child. Freeman said she merely stood by and permitted Nunez to kill them both. Nunez swore that they each killed one. The bodies of both children showed evidence of wounds suffered before they were thrown over the precipice. The pictures tended to corroborate the state's theory that Nunez was telling the truth. Both Freeman and Nunez said that at least one of the children was beaten with tire irons before they were thrown to their deaths. Freeman attributed all these acts to Nunez, but Nunez admitted only part of them. All of this evidence was relevant on the score of malice and premeditation. There was no error in receiving the exhibits. It may well be true that without such evidence the jury might have found the defendant guilty of first degree murder with a recommendation of life imprisonment. However, since it is the exclusive function of the jury to fix the penalty, the jury ought to be entitled to examine the evidence relevant to the penalty.

The final assignment of error which challenges any ruling made during the trial is based upon the theory that it was error to permit a police officer to identify a photograph of a spot of blood found on a stone wall at the scene of the crime. The picture was marked as an exhibit, but it was never offered. It is contended that since the state did not prove that the blood was of the same type or group as that of the

murder victims, or indeed that it was even human blood, it was error to permit any testimony concerning the finding of such blood. It is also urged that it was error to permit the exhibit to be marked. The assignment is without merit on both points. The state might have gone further and connected the spot of blood with the crime, but its failure to do so could not be a ground for reversal. As noted, Freeman herself testified that the boy was beaten with a lug wrench before he was thrown over the precipice. There was other evidence of bloodshed, most of which came in without objection. No possible prejudice could have resulted from the fact that the state's evidence was incomplete in the particulars complained of.

None of the eight assignments of error reveals a ground for reversal. It is a tribute to the skill of the trial court and counsel that so lengthy a trial did not result in more numerous controversial rulings. The trial was eminently fair. It remains to be seen whether, outside the courtroom, the defendant was deprived of any of her constitutional rights in any of the particulars now raised by her counsel for the first time.

■ It will be recalled that the defendant did not appear before an Oregon magistrate until after she had been in custody in two states for a combined period of seven days. Counsel now contend that, under the so-called McNabb-Mallory rule enforced in the federal system, Freeman is automatically entitled to a new trial in which no use can be made by the prosecution of any statement given by her to the police during the time she was held in custody before she was taken before a magistrate. The contention is based upon *McNabb v. United States,* 318 US 332, 63 S Ct 608, 87 L Ed 819; and *Mallory v. United States,* 354 US 449, 77 S Ct 1356, 1 L Ed2d 1479. The rule in those

cases, based upon the power of the court to supervise the administration of justice under the federal system, is a prophylactic rule designed to eliminate possible police oppression by providing an arbitrary and automatic remedy for a defendant who can show that he has been subjected to unlawful delay in appearing before a magistrate.

This case does not require us to re-examine our previous decisions which have rejected the McNabb-Mallory rule. See, e.g. *State v. Leland,* 190 Or 598, supra. There is no showing that any statement made by Freeman, and used in the trial, was given to the police after she should have been taken before a magistrate. The interstate extradition procedures followed in the case at bar did not include an unlawful delay in presenting Freeman before a magistrate. See *Gallegos v. Nebraska,* 342 US 55, 72 S Ct 141, 96 L Ed 86. The undisputed testimony, including that of the defendant herself, is that she was arrested about 7:30 in the evening of May 16 on a telegraphed advice of an outstanding Oregon warrant for first-degree murder. She was taken to an Oakland police station, where she was kept waiting about one hour while an officer from the homicide detail was sent for. She was questioned only perfunctorily and was asked if she would mind writing out in her own handwriting a statement of her activities for the previous five days. She did so. After two additional conversations with the police, and about five or six hours after her arrest, she was booked and locked up for the night. The next morning, at her request, she consulted an attorney from the office of the public defender. The next day she waived extradition.

At no time during the trial did the defendant, or her attorneys, contend that any delay in taking her

before a magistrate had a causal connection with the giving of such statements as she gave the police. See *Rogers v. Superior Court,* 46 Cal2d 3, 10, 291 P2d 929. She has never repudiated her statements. Indeed, when she took the stand she told the jury substantially the same story that is contained in her oral and written statements. In *State v. Kingsley,* 137 Or 305, 2 P2d 3, 3 P2d 113 (1931), also a first-degree murder case, this court held that sending a written confession to the jury room could not have been error where the defendant had taken the stand and testified to substantially the same facts as those set forth in the confession challenged on appeal. In *State v. Hatcher,* 29 Or 309, 44 P 584 (1896) this court held that while it was error to admit over the defendant's objection a statement given by him which was not shown to be voluntary, the error was cured when the defendant later took the stand and told substantially the same story from the witness chair. See, also, concurring opinion in *People v. Garner,* 57 Cal2d 151, 18 Cal Rptr 40, 53, 54, 367 P2d 680, 693, 694 (1961), cert. den. 82 S Ct 1571, 8 L Ed2d 508. Accordingly, under the circumstances of this case, where the statements which Freeman gave the police while in their custody were no more damaging to her defense than was her own testimony to the same effect before the jury, we need not consider whether it might have been error to receive such statements in evidence if timely objections had been made. ('The defendant did object to a portion of one tape recording made by Oregon police officers because it tended to blacken her character in particulars not relevant to the indictment. That objection was sustained.) Again, even if it might be questioned whether an objection was necessary if indeed the police obtained incriminating statements

from Freeman before she was advised of her rights by a magistrate as required by ORS 133.550 and 133.610, there is likewise no need to consider that question when her statements to the police were repeated to the jury in substance by her own testimony from the stand. There was no reversible error in connection with the delay, if any, in presenting Freeman before a magistrate.

■ In her brief on appeal, the defendant now contends that she was denied due process of law because she was in cusody a total of 18 days before she was represented by counsel. While her present counsel were not appointed until after she was indicted, she was not in custody 18 days without legal advice. The day after her arrest she was given the opportunity to consult with the public defender in Oakland and received the advice to which we have referred. However that may be, there was no undue delay in appointing counsel to represent her. The circuit court acted in the matter as soon as it had jurisdiction to do so. There is nothing in the record to suggest, and the defendant does not now contend, that she was ever denied an opportunity to talk to a lawyer prior to her arraignment in circuit court. Cf. *Crooker v. California*, 357 US 433, 78 S Ct 1287, 2 L Ed2d 1448, and cases discussed in *State v. Kristich*, 226 Or supra at 247. She was without funds to hire counsel, but as soon as practicable after Freeman was indicted, the court appointed counsel. Counsel attended her at her arraignment and at all proceedings thereafter.

Under the record before us it is unnecessary to decide in this case whether or not an attorney should have been appointed for the defendant at the time of her preliminary appearance in the justice court as is now required by ORS 133.625. That statute did not

take effect until after the defendant had been indicted in this case. She thus had no statutory right to counsel at public expense at any time before her counsel was appointed. Whether it might have been within the power of the justice court to have appointed counsel earlier, on its own motion, and without statutory direction (See *State v. Delaney,* 221 Or 620, 640, 332 P2d 71, 351 P2d 85), we need not decide. It is sufficient to note that no constitutional right was violated. See discussion of this point in the concurring opinion in *People v. Garner,* supra.

In the recent United States Supreme Court case of *Hamilton v. Alabama,* 368 US 52, 82 S Ct 157, 7 L Ed2d 114, the absence of counsel at an arraignment in a trial court was held to be a denial of due process under the Fourteenth Amendment. Apparently under Alabama law vital decisions bearing upon the conduct of the defense, e.g., the plea of insanity, etc., must be made at the arraignment or not at all. Such is not the law in this state. There is a further reason why *Hamilton v. Alabama* has no application in the case at bar. Freeman was represented by counsel at her arraignment, and at all times thereafter. We have found no case which supports the theory of the defendant that she was denied due process of law under either the state or federal constitution when counsel was not appointed for her at her preliminary examination before the justice of the peace. At the time of Freeman's preliminary examination there was no procedure under Oregon law for the appointment of counsel, and there was nothing in the state or federal constitution to require that such appointment be made. The fact that the Assembly has since enacted laws to provide for earlier appointment of counsel in future cases does not create error where none existed.

■ In her brief, the defendant also contends that she was denied a fair trial in other particulars upon which no record was made in the court below. She now contends that she was deprived of a fair trial because the district attorney brought into the courtroom two tire irons and displayed them in the presence of the jury even though they were never offered in evidence. There is no showing of bad faith on the part of the state. See *State v. Shaw*, 231 Or 345, 372 P2d 777 (1962). If counsel thought the exhibits were harmful to the defense, a word to the court in chambers would no doubt have resulted in their being put out of sight until offered in evidence. The defendant argues that she was prejudiced by an officer's testimony about tire irons, and suggests that the state acted in bad faith in producing such testimony. The inability of the state to develop the proper connecting links to make the exhibits admissible does not prove bad faith. Freeman herself testified that the boy was beaten with a tire iron. Her present objection is obviously an afterthought.

■ The final proposition urged here for the first time is that Freeman was unfairly treated during the trial because two police officers talked to her briefly while she was in custody during a recess in the trial. In one episode, according to her affidavit, an officer asked her for a shirt she had been wearing, and she gave it to him. There is no suggestion how this episode could have resulted in any prejudice to her defense, except, as her brief suggests, to make her nervous. If the episode actually occurred, there is no showing that it handicapped the defense. The shirt was never used in evidence. The other episode, according to Freeman's affidavit, was a conversation between Freeman and an Oakland police officer who was on

hand for the trial. He allegedly suggested that she plead guilty to second-degree murder. There is no showing how this conversation, if it occurred, could have embarrassed or prejudiced the defendant in any way. If, as she now contends, she was rendered unable to give attention to her defense, she would no doubt have had her attorneys mention the matter to the court so that proper precautions could have been taken to assure her freedom from harassment.

This court has examined the record in light of each of the points raised by the defendant, and has examined it additionally for evidence of any other irregularities, not raised by the defendant. We have found no basis for reversal.

Affirmed.

O'CONNELL, J., specially concurring.

I concur in the result. As the principal opinion points out, the defendant took the stand and gave testimony in her own defense which was substantially the same as the statements she had made to the police during her detention. Any error which may have resulted in receiving these pre-trial statements in evidence was thereby cured. It is not necessary in this case, therefore, to consider the legality of police interrogation during detention nor the circumstances under which a person is entitled to counsel between arrest and trial. For that reason I do not wish to join in the comments on these matters made in the principal opinion.

SLOAN, J., joins in this opinion.