Argued October 2, 1963, affirmed March 25, 1964

# ALCORN *v.* GLADDEN
390 P. 2d 625

*Duane R. Ertsgaard,* Salem, argued the cause and filed a brief for appellant.

*C. L. Marsters,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was Robert Y. Thornton, Attorney General, Salem.

Before McAllister, Chief Justice, and Rossman, Sloan, Goodwin and Lusk, Justices.

McALLISTER, C. J.

This is a proceeding brought by the petitioner, James Eugene Alcorn, under the Post-Conviction Hearing Act, ORS 138.510 to 138.680. The trial court after a hearing denied the petition for relief, and petitioner appeals.

Petitioner's amended petition alleges that his rights under the state and federal constitutions were violated in that (1) the judge who accepted his plea and imposed sentence on him was prejudiced, (2) his plea of guilty was coerced by beatings and the promise of a light sentence, and (3) the trial court failed to advise

him of his right to counsel and failed to appoint counsel for him.

It appears that in December, 1949 a charge of knowingly uttering and publishing a forged bank check was filed against Alcorn in Klamath county. On December 7, 1949 Alcorn was arrested in Alturas, California, waived extradition, and on December 9, 1949 was returned to Klamath Falls by the sheriff of Klamath county.

On January 9, 1950 Alcorn was indicted on the above charge by the Klamath county grand jury.

On January 12, 1950 Alcorn was arraigned in the circuit court for Klamath county, before the Honorable David R. Vandenberg, circuit judge. Petitioner was allowed until January 19, 1950 in which to plead to the indictment. At the arraignment Alcorn was represented by E. E. Driscoll, a lawyer of Klamath Falls. The journal entry on arraignment, after the recitation that Alcorn appeared in person and by E. E. Driscoll of counsel, contains the notation "arraignment only." The record is clear that Alcorn was not represented by counsel in his subsequent court appearances.

On January 19, 1950, Alcorn appeared before Judge Vandenberg and entered a plea of guilty to the crime charged in the indictment. On January 21, 1950 Alcorn appeared again before Judge Vandenberg, and was sentenced to the penitentiary for a term not to exceed 20 years. The sentence was the maximum penalty authorized by law for the crime of which Alcorn had been convicted. § 23-562, OCLA.

In 1954 Alcorn was represented by Shirley A. Field, a Portland attorney, who succeeded in obtaining a parole for him. The parole was granted in July, 1954 and revoked in June, 1955.

Later while petitioner was represented by Charles O. Porter, a Eugene attorney, he was again paroled. The second parole was granted in September, 1957 and was revoked in December, 1957.

On October 27, 1958 petitioner filed in the circuit court for Klamath county a motion to vacate his judgment of conviction, which motion he described as in the nature of coram nobis. In his motion Alcorn contended that his conviction was invalid because a certified copy of the file in his case, apparently obtained by Alcorn from the county clerk, did not contain a copy of the check described in the indictment, but did contain a copy of another check. The record does not disclose why the clerk furnished Alcorn a copy of a different check than the one described in the indictment. The original check described in the indictment was introduced into evidence at the coram nobis hearing and is in the record filed in this court. In any event, the discrepancy was seized upon by Alcorn and made the basis for his motion to vacate his conviction. The motion to vacate the judgment was stricken by an order entered on November 13, 1958.

On April 16, 1959 Alcorn filed in the circuit court for Klamath county an amended motion in the nature of coram nobis. The amended motion alleged no new ground for relief, but did allege that Alcorn was not guilty of the crime of which he had been convicted. The court set the motion for hearing on July 2, 1959. On that day Alcorn filed a further amendment to his motion, in which he alleged for the first time that he had not been advised of his right to have counsel appointed for him and that he was induced to plead guilty by beatings, the threat of further beatings and the promise of a light sentence.

110

■ On July 2, 1959 a hearing on petitioner's motion as amended was held before Judge Vandenberg. At the hearing Alcorn appeared in person and by his attorneys, James F. Bodie and Gottlieb J. Baer. By an order entered on July 10, 1959 Alcorn's motion to set aside his conviction was denied. That order was not appealable. *State v. Endsley,* 214 Or 537, 331 P2d 338.

On September 14, 1959 Alcorn applied to the United States District Court for the District of Oregon for a writ of habeas corpus. The application was denied without a hearing, and Alcorn appealed to the United States Court of Appeals for the Ninth Circuit. The Court of Appeals affirmed on the ground that Alcorn in failing to seek relief under the Post-Conviction Hearing Act had not exhausted his state remedies. *Alcorn v. Gladden,* 286 F2d 689 (9th Cir 1961).

On April 4, 1961 petitioner filed in the circuit court for Marion county a petition for relief under our Post-Conviction Hearing Act. In this petition Alcorn for the first time alleged that Judge Vandenberg had accompanied the sheriff of Klamath county when the sheriff returned Alcorn from Alturas to Klamath Falls, and that because of events that occurred during said trip Judge Vandenberg was prejudiced against Alcorn.

On April 6, 1961 his present counsel was appointed to represent petitioner. On June 5, 1961 petitioner filed an amended petition in the post-conviction proceeding. The defendant answered with a general denial. On July 28, 1961 the cause was transferred for trial to the circuit court for Klamath county pursuant to ORS 138.560 (4).

On June 28, 1962 the cause was tried in Klamath county before the Honorable Charles H. Foster, circuit

judge. The testimony of petitioner and his witnesses was heard, and in addition there was introduced by petitioner, without objection, the reporter's transcript of the testimony taken at the hearing held in July, 1959 on petitioner's motion to vacate the judgment. On July 17, 1962 Judge Foster entered an order denying in its entirety the petition for post-conviction relief. From that order this appeal was taken.

■ There is no doubt that if Alcorn's testimony is true, he was not afforded due process of law and his conviction should be set aside. The experienced trial judge who heard the testimony concluded, however, that Alcorn was not worthy of belief and that his rights under the state and federal constitutions had not been violated. These findings of the trial court on the issues of fact are conclusive. ORS 138.650 provides that the scope of our review in post-conviction proceedings is "the same as that provided by law for appeals in criminal actions." ORS 138.220 provides that in criminal actions "the judgment or order appealed from can be reviewed only as to questions of law appearing upon the record." We are not authorized to reexamine disputed questions of fact. *State v. Wilson,* 6 Or 428 (1877); *State v. Kingsley,* 137 Or 305, 324, 2 P2d 3, 3 P2d 113 (1931); *State v. Reynolds,* 160 Or 445, 471, 86 P2d 413 (1939); *State v. Moore,* 194 Or 232, 243, 241 P2d 455 (1952).

■ We have carefully considered the record and find ample evidence to support the findings of the trial judge. The first ground for relief alleged by petitioner is that Judge Vandenberg was prejudiced against him. This ground is based on the circumstance that when Jack Franey, the sheriff of Klamath county, drove to Alturas on December 9, 1949 to return Alcorn to

Klamath Falls, Judge Vandenberg made the trip with him. It appears from the record that the sheriff of Modoc county, California, of which Alturas is the county seat, had been accidentally killed a day or so earlier, and that Judge Vandenberg, who had been acquainted with the decedent, went to Alturas to pay his respects to the widow.

The petitioner alleges that he was unaware of the identity of Judge Vandenberg, and that during the trip from Alturas to Klamath Falls he was questioned at length by the sheriff and the judge, and that as a result of said questioning Judge Vandenberg "became angry with and prejudiced against the" petitioner. The petition also alleges that when petitioner appeared for sentencing Judge Vandenberg referred to an "F. B. I. Report" and questioned petitioner about his criminal record as set forth therein. The petition alleges that "said report contained a record of many alleged crimes that plaintiff did not commit and said report was in many respects erroneous." The petition further alleges "that Judge Vandenberg was prejudiced against the plaintiff by reason of the events that took place during the drive from Alturas to Klamath Falls and by further reason of the erroneous and false information contained in the 'F. B. I. Report'."

It is conceded that Judge Vandenberg did go to Alturas with Sheriff Franey, and did ride back in the car with the sheriff and Alcorn. It was, of course, inadvisable for Judge Vandenberg to ride with the sheriff when the sheriff was transporting a prisoner who would later appear before the judge. However, there is no evidence that this experience caused Judge Vandenberg to be prejudiced against petitioner except petitioner's testimony, which in itself is largely a con-

clusion based on the sentence imposed. There was reason for the imposition of a long sentence. Petitioner had been convicted of desertion from the army and sentenced to imprisonment for five years, which term was increased to six years because of an escape from custody. He had been convicted of forgery in Washington and sentenced to a term in the Washington State Reformatory, and had also been convicted of a "bad check charge" in Montana.

We think there was ample reason for the trial court to reject petitioner's testimony. If petitioner's charge of prejudice was sincere, it is incredible that he would not mention it for more than 11 years after his conviction. Neither petitioner's original motion to vacate his conviction filed in 1958, nor his amended motion filed in 1959, nor his habeas corpus petition filed in the United States District Court mentioned any prejudice on the part of Judge Vandenberg. It was not until the petition in this proceeding was filed in April, 1961 that petitioner mentioned that Judge Vandenberg had accompanied the sheriff on the trip to Alturas.

■■ Petitioner also alleges as a ground for postconviction relief that his right to be represented by counsel was effectively denied. The record is clear that petitioner did consult with an attorney, E. E. Driscoll, who appeared in court with him upon arraignment. It is also clear that Driscoll withdrew because petitioner could not pay him a fee, and that petitioner did not have counsel thereafter.

Petitioner does not contend that the court refused to appoint counsel for him, but rather that he was not advised of his right to have counsel appointed. Judge Vandenberg testified that he did advise peti-

tioner of his right to counsel and offered to appoint counsel for him. There is other evidence corroborating Judge Vandenberg's testimony. The lack of substance in this charge and petitioner's lack of candor in making it are revealed by petitioner's testimony at the coram nobis hearing on July 2, 1959. He testified that this charge rested, not on his recollection of the facts, but solely on the absence in the record of any recital that he had been informed of his right to counsel. We quote from his testimony:

"Q  Now, you were brought up here on or about the 19th day of January, 1950, to enter your plea; is that correct?

"A  Yes.

"Q  Now, you testified that you had not been advised by the Court or by the District Attorney that it was your right to have counsel at that time, or that the court would appoint you counsel. Now, did you have any discussion about your right to counsel on the 19th when you came into court here to enter your plea? This is the first time you were back after the 12th, and on the 12th you said you were represented by Mr. Driscoll. Now, this is on the 19th, the second time you were in this court. Now, do you recall about what happened about whether you were advised when you were in court on the 19th about your right to counsel, if any?

"A  That has been an awful long time ago, and I just don't recall. I don't recall anything being brought up at that time. However, in getting my records from the court it showed nowhere that I had been advised about counsel, so therefore I had to go along with the way the record read, that I hadn't been advised according to the record that I had. And I have an affidavit to the effect that it is a true copy and the whole thereof of the record.

"Q  Now, forgetting about the record, just as far as your own memory is concerned, your own

personal knowledge, do you recall of your own knowledge, forgetting about your record that you have studied, do you recall of your own knowledge whether or not the Judge advised you here of your right to have counsel?

"A That I couldn't tell you. I was in a turmoil, you know, I was just kind of confused, I don't remember that in particular. The only thing I can remember so outstanding is the things that happened to me before that and around that time, the pressure that was on me all the time.

"Q Just take it easy here. Can you say as far as your memory goes, do you know if you were advised, as far as your own memory, on the 19th of January?

"A I just can't recall that. I just can't recall it if I was.

"Q Now, in your earlier testimony you said that you had not been advised. What was that testimony based on?

"A Well, I was under the assumption that the record speaks the truth, and I was supposed to have the whole record. It doesn't show on the record I was ever advised. It was six years later I got this record, and I have it and it doesn't show on the record if I was ever advised by the Court."

ORS 135.310, which was enacted in 1864, makes it the duty of the circuit court to inform a defendant, appearing for arraignment without counsel, of his right to counsel, and to ask such a defendant if he desires the aid of counsel. It is presumed that this statute was complied with. *In re Application of Loundagin*, 129 Or 652, 661, 278 P 950 (1929). In view of this presumption, the testimony of Judge Vandenberg and the other witnesses, and the equivocal nature of petitioner's testimony, it is not surprising that the trial court found that petitioner had understandingly waived his right to counsel.

■ Petitioner asserts as a third ground for relief that he was coerced into pleading guilty by beatings administered by Sheriff Franey and by a promise that if he would plead guilty he would be given a light sentence. It is established by independent evidence that while petitioner was confined in the Klamath county jail he was struck on one or more occasions by Sheriff Franey. The dispute centers about the extent and purpose of the blows. Petitioner describes the blows as severe beatings and testified that he pleaded guilty in order to avoid further abuse. According to testimony of other witnesses the blows struck by the sheriff were not of a serious nature and were struck not to coerce a plea of guilty, but because the sheriff was angered by Alcorn's conduct and by reports that Alcorn was planning to escape. James Murray Britton, who is now the sheriff of Klamath county, and who in 1949 was a deputy under Sheriff Franey, testified as follows:

"Q  Did you observe anything that you would describe as physical violence occurring between those two men of any sort?

"A  Yes, I faintly remember an incident, in fact a couple of incidents.

"Q  Would you describe what these were?

"*   *   *   *   *

"A  The first time, Franey had went up at the request of Mr. Alcorn, it seems like, and of course I was with the Sheriff and they talked a few minutes. I don't remember what it was about, but they evidently became angry at each other. And I stopped them from hitting each other.

"Q  Did you observe either one of them strike a blow?

"A  Yes, I remember the Sheriff striking Mr. Alcorn and I stepped between them. I was stand-

ing just behind the Sheriff at the time, and I remember I stepped in between them and that's about all there was to it. And now at another time, a little later, there was another one, and I don't remember the date, sir.

"Q But this other one was subsequent, it was later. Do you recall anything of the details of what happened at that incident?

"A Midnight on New Year's Eve between '49 and January 1st, 1950, there was a car had driven around the jail several times late that night and I was on guard up in the Sheriff's office, and at Sheriff's request. And I'm sure that the Sheriff more or less blamed Mr. Alcorn for that car coming around the jail that night, attempting a jail break. And I am sure that shortly after the first of the year, a few days after January 1st, 1950 that they had another argument, and I was with them, I am just sure that was what it was.

"Q Were there any blows struck during this argument as you recall it?

"A It seems like the Sheriff once more or less attempted to strike Mr. Alcorn and I broke it up again, yes.

"Q You wouldn't consider this a serious incident or a beating, the way you describe it?

"A Oh, no, no there was no beating, but it was an incident.

"Q When you say striking, would this be a slap or a fist, was it a blow to the face or body, or do you recall?

"A I recall a blow to the upper part of the body, I am sure it was to the mouth or something, and I don't think any damage was done, but I immediately stepped between them, and I remember it."

Mr. Dale Mattoon, who was the night jailer while

Alcorn was confined in the Klamath county jail, testified as follows:

"Q Now, Mr. Mattoon, calling your attention to the early part of January, 1950, did you have occasion to be present at any time when Sheriff Franey was present with the defendant in the county jail?

"A I did.

"Q And when was that?

"A I couldn't give you an exact date, but it was somewhere around January 15th, 14th or 15th.

"Q Now, what was the reason, if you know, why the Sheriff was talking to the defendant James Alcorn?

"A He was talking to him about his conduct in the Klamath County jail.

"Q And what, if anything, was said relative to that at that time, if it was said in the presence of the defendant?

"A It was. He was in a cell by himself right over the office, and Mr. Franey came over to the jail with Mr. O'Neill and said 'Bring down Alcorn, I want to talk to him.' So I brought him down from the cell and brought him into the room where we used to call it a bedroom where I had my bed.

"Q Is that where the barber chair presently is?

"A Yes.

"Q What, if anything, occurred after you brought Alcorn down?

"A Well, Franey told him he had had enough of his nonsense there in that jail.

"Q What had the defendant been doing to your knowledge?

"A He had been talking out the window at the people on the sidewalk, and he had also been taking his spoon and running it up and down on the screen on the window.

"Q What did that do, create a racket?

"A That created a racket all over the whole jail, especially at night time.

"Q  What, if anything, did Sheriff Franey say or do to the defendant at this time?

"A  He told him he had put up with his conduct as long as he was going to; and about that time he gave him a big shove, I don't know what you would call it, but where we hang our clothes there in that little bedroom—it is more of a kind of a tall dresser with doors on it, and we hung our clothes in there— and he shoved him up against that.

"Q  Did Sheriff Franey at any time on this occasion talk to the defendant about his pleading guilty?

"A  He said nothing about pleading guilty to anything.

"Q  Did the Sheriff threaten him in any way to get him to plead guilty?

"A  The only thing he was talking to him about was his conduct while in the jail there."

We deplore the fact, as did the trial judge, that the petitioner was struck by the sheriff. We are confident that the trial judge would without hesitation have set aside petitioner's conviction if he had found that any attempt was made, by force or otherwise, to induce petitioner to plead guilty. The resolution of this issue turned on the credibility of the testimony. The trial judge who saw the witnesses and heard them testify was not persuaded that the sheriff's conduct contributed in any degree to Alcorn's plea of guilty. The finding of the trial judge is binding on us.

Finding no error, the order of the trial court is affirmed.